MAXWELL B. FIELDS, Respondent, v. PREDIONICA I TKANICA A. D., Defendant, and ROYAL YUGOSLAV GOVERNMENT, Appellant.

First Department, November 13, 1942.

*William M. Chadbourne* and *Gerald B. O'Neill* for appellant.

*Meyer Grouf* and *Samuel R. Wachtell* for respondent.

CALLAHAN, J.   Plaintiff, having obtained an attachment against the property of the defendant, caused a levy to be made

thereunder on July 14, 1941, on 963 bales of cotton, which were part of the cargo of the SS *Bosiljka,* then in the Port of New York.

The Royal Yugoslav Government, appearing specially pursuant to permission granted by this court (see 263 App. Div. 155), moved to vacate the levy. It asserts the ownership of the cotton, claiming to have requisitioned it prior to the date of the levy. Plaintiff disputes the existence of any governmental requisition, and questions the validity thereof, if one was attempted.

Service of process in this action was made on the defendant by publication. Defendant has defaulted. The officers of defendant are in Yugoslavia. That country was occupied by the enemy armies of Germany and Italy before the publication of the summons. Under the circumstances, it can be readily understood that defendant's officers, or other Yugoslav claimants, have had no opportunity to appear in this suit. In fact, the Yugoslav Minister states that it has been impossible to ascertain the whereabouts of the officers of the defendant corporation.

On the motion to vacate the attachment, Special Term appointed a referee to hear and report on the following questions: (1) whether the Royal Yugoslav Government, acting through its Minister, attempted to requisition the vessel, the steamship *Bosiljka,* and/or its cargo, and attempted to vest title to the 963 bales of cotton in the Yugoslav Government; and (2) if there was a purported requisition, whether it was in accordance with Yugoslav law.

The referee reported against the contentions of the Yugoslav Government, answering both questions in the negative.

The present appeal is from an order confirming the referee's report, and denying the motion to vacate the attachment.

Upon the hearing before the referee, no witnesses were called. The record consists of stipulations concerning some of the facts, and documentary proof. By consent of the parties affidavits were submitted by both sides from persons claiming to be experts as to the law of Yugoslavia.

Plaintiff is the assignee for collection of one Ernest Zucker, a resident and citizen of the Argentine Republic. Defendant is a corporation organized under the laws of Yugoslavia and having places of business in that country and elsewhere. Plaintiff's action is for breach of contract. He claims that defendant owed Zucker a large sum of money under an agreement made and to be performed outside this State, whereby defendant promised to pay Zucker a certain sum as the purchase price of a business sold by Zucker to defendant corporation.

No issue as to the rights of domestic creditors is involved herein.

The events leading up to and in connection with the alleged requisition may be summarized as follows: On March 16, 1941, prior to the existence of a state of war between Yugoslavia and Germany, the steamship *Bosiljka,* then owned by Alceau Steamship Company, a corporation of the Kingdom of Yugoslavia, sailed from New York under the Yugoslav flag. The vessel had been loaded in the Port of New York with cargo destined for Istanbul, *via* the Suez Canal in transit to Yugoslavia. Eighty per centum of the cargo consisted of goods consigned to the Yugoslav Government; the remaining twenty per centum was shipped to private consignees. In the latter category were 963 bales of cotton consigned to the defendant. At the time of the invasion of Yugoslavia by Germany and Italy, which occurred on April 6, 1941, the steamship *Bosiljka* was on the high seas. Learning of the invasion of its home country, it put in to the Port of Recife, Pernambuco, Brazil. There it remained for several weeks during which time many messages were exchanged between the captain of the vessel, the Royal Yugoslav Ambassador to the United States, and the British authorities in Brazil. Eventually, and at the request of the Yugoslav Minister, the vessel was seized by the representatives of the British Government, with the co-operation of representatives of the American and Brazilian Governments. This seizure was caused by the fact that the captain of the vessel had refused to either proceed with his journey, or to return with the vessel to the United States. Instead, he had consulted with representatives of the Italian Government, a nation with which Yugoslavia was then at war. Acting on the directions of the Home Ministry of the Yugoslav Government, which directed that the steamship *Bosiljka* be sent to the United States and the cargo sold, a British crew was placed on the vessel, and it was returned to New York. Upon arrival the Yugoslavian Minister took charge, and placed a Yugoslav master in command. Permission was obtained by the Yugoslav Government from the United States Government to unload the vessel. Application was made to the United States Treasury Department for a license to sell the cargo, including the cotton. A limited license was issued which required further application before any specific item might be sold. While the vessel was being unloaded, the attachment herein was levied.

During the occurrence of these events, the Yugoslav Government had been in flight from Yugoslavia to Greece, and thence

to Palestine and London. It has since been in exile in the latter city, and is functioning there as a friendly sovereign power. The Government of the United States continues to recognize the government that is temporarily established in London as the Royal Yugoslav Government. The diplomatic and consular officers of said government in the United States are recognized by our government in the full exercise of their functions in this country. However, no representation has been made to this court by the executive branch of our government as to the merits of the claim of requisition. Accordingly, this question remains open for judicial determination.

The present controversy as to whether defendant had an attachable interest in the cotton arises because of the fact that different inferences may be drawn concerning the intention of the Yugoslav Government as to the disposition of the steamship *Bosiljka* and her cargo. The question at issue is whether the Yugoslav Government intended to take title to the vessel and its cargo, or merely to take temporary protective custody, permitting title to remain in the former owners.

The referee held that there had been no attempt or intent on the part of the government to requisition either the vessel or the cargo so as to vest title thereto in the Yugoslav Government. We interpret the documents and other evidence in this case differently.

Distinguishing for a moment between the vessel and her cargo, we find that the record overwhelmingly indicates that it was the intention of the representatives of Yugoslavia to requisition the vessel itself for military purposes. Whether this involved a vesting of title to the vessel, or merely a requisition of its use, is immaterial to the present inquiry. The representatives of that government have stated under oath that the vessel was requisitioned. There appears to be no basis for the referee's finding that the Yugoslav Government merely assumed temporary protective custody. It appears clear that the initial purpose in seizing the vessel was to prevent it from falling into the hands of the country's enemies. Danger of this eventuality was then immediate and impending, for the captain of the vessel had consulted the representatives of an enemy country. Having requisitioned the vessel and brought it here, the Yugoslav Government proceeded to use it in assisting its allies in waging war against Germany and Italy. The vessel was chartered to Great Britain for that purpose.

Some mention is made by the referee in his report that in connection with this charter a certificate referred to as an " On-

Survey '' report was signed by the Yugoslav master who was in charge of the vessel, and that this document designated the Alceau Steamship Company, the former corporate owner, as the owner of the vessel. This, the referee held, indicated an acknowledgment of the continuation of private ownership. Though this recital, standing alone, might justify the inference indicated by the referee, other portions of the exhibit referred to negative that inference. The document recites that it was being made ''Prior to service under Government Liner Requisition Scheme.'' It stated that the Government was being represented by a surveyor attached to Lloyd's Register of Shipping, and the owner by the master, who was the representative of the Yugoslav Government in charge of the ship. It further stated that the object of the '' On-Survey '' report was '' to provide an agreed basis showing the condition of the ship at the time of survey and so assist in determining the extent of the re-instatement and reconditioning, if any, for which Government may be liable on the discharge of the ship from H. M. Service.'' It is quite likely that the '' Government '' thus referred to was the British Government which was chartering the vessel. Therefore, the document indicates that the Yugoslav Government was acting as owner in chartering the steamship *Bosiljka.* The very act of chartering indicated that the Yugoslav Government deemed it had the right to exercise the functions of one either having title to the vessel or the right to dispose of its use. This act of chartering certainly did not indicate that the vessel had been seized merely for temporary protective custody, as held by the referee.

Considering now the cargo, as distinguished from the vessel, we have already pointed out that this cargo consisted of two groups of merchandise: (1) that owned by the Yugoslav Government itself, and (2) the balance consigned to private concerns in Yugoslavia. Of course, there can be no doubt that the Yugoslav Government intended to repossess itself of the eighty per centum of the cargo representing its own property. The only doubt that may exist is whether it was the intention of the government to vest title in itself as to the remaining twenty per centum of the cargo which had been consigned to private consignees. It would seem significant that, with the single exception of a statement made in an application for a license from the United States Treasury Department concerning the disposition of the proceeds of the sale, all action taken concerning the twenty per centum of the cargo of the vessel after its seizure was identical with that taken with respect to

the eighty per centum thereof. The documents show that the Yugoslav Government first attempted to have the whole cargo delivered to a port designated by it. When this became impossible, it directed a seizure and sale of all of the cargo. Up to the time the cargo was about to be sold, no differentiation was made between the two classes of cargo. Then the following statement was made in the application to the United States Treasury Department to .sell the whole of the cargo: "The Yugoslav Legation proposes to discharge the cargo in New York, to warehouse it there and then to sell it, depositing the proceeds of the property owned by the Yugoslav Government in an account (hereinafter referred to as 'Account No. 1') to the credit of that government and depositing the proceeds of the cargo consigned to private firms in Yugoslavia in an account (hereinafter referred to as 'Account No. 2') for the benefit of whom it may concern. The Yugoslav Government proposes, at the conclusion of the war, or when the rightful owners of the funds deposited in 'Account No. 2' can be ascertained, and their wishes free from any coercion determined, to pay over such funds to such rightful owners after deducting the necessary expenses in connection therewith." In construing this statement, we must not overlook the fact that the Royal Yugoslav Government proposed the sale of all of the cargo. This was clearly an exercise of dominion indicating a claim of title. Unless the government was selling as agent for the true owners, it must have been acting under a claim of ownership. No proof was introduced to show that it ever intended to act as agent of the owner, or other than in its governmental capacity. In fact, the true owners were in no position to appoint agents.

In addition, the statements in the application for a license show an intention to hold the proceeds of the sale until the conclusion of the war. It indicates the desire of Yugoslavia to permit its nationals to express their wishes free from coercion. This was another precaution to prevent its enemies from obtaining any part of the proceeds — a military purpose. Thus, an analysis of the statement in the application for a license, so largely relied on by plaintiff, was not indicative of an intention to permit title of the proceeds of the sale to remain in the consignee.

Plaintiff also points to a further statement in an affidavit of the Yugoslav Minister to the effect that it was the intention of his government "to retain title" to the cotton, and other property requisitioned, only until such time as the rightful owner thereof could be determined. This expression of the

intention "to retain title" must be read in connection with its context. So read, there can be no doubt but that it was the proceeds of the sale, and not the "title" to the cargo, that was to be retained for the benefit of the true owner. The mere expression of intention on the part of the Royal Yugoslav Government to create a fund for the protection of its nationals did not mean that the former consignees would have an attachable interest in such fund. The fund to be created was the property of a sovereign power destined for a public purpose. It thus had sovereign immunity. (*The Parlement Belge*, L.R. 5 P.D. 197.) That public purpose was two-fold in nature: (1) to see that the fund did not get into enemy hands; and (2) to protect its nationals who were not presently in a position to protect themselves. The first is a military purpose, and the second a step in the fundamental duty of a nation to protect its citizens and their property.

In determining the question of intention as to vesting of title, we must take into consideration not only the statements made after the seizure, but the actions and immediate objective of the Royal Yugoslav Government at the time of the seizure. Undoubtedly at that time it acted to prevent the goods from falling into enemy hands. The power to requisition for such a purpose is a necessary attribute of sovereignty. (*Mitchell* v. *Harmony*, 54 U. S. 115.) While plaintiff concedes the existence of the inherent sovereign power to requisition within the territorial limits of a nation, it disputes its existence outside such limits, and in the circumstances attendant here. This contention seems to be based on the assumption that the seizure made in a port in Brazil was a forcible one which violated the sovereignty of Brazil. Plaintiff points to the rules of international law that prevent one sovereign from authorizing its agents to perform any sovereign function within the domain of another, without the latter's consent. (See *United States* v. *Deutsches Kalisyndikat Gesellschaft*, 31 Fed. Rep. [2d] 199.) This argument rests on a false premise, for here the steps taken in Brazil appear not only to have proceeded with the consent of the Brazilian authorities, but with their assistance. Claimant so alleges, and there is no averment disputing this statement. We have, therefore, a situation where no forcible or disorderly seizure took place but one in which the nation in whose jurisdiction the seizure occurred acquiesced.

In *Ervin* v. *Quintanilla* (99 Fed. Rep. [2d] 935, at p. 940) it was stated: "No case has been cited, none can be found in any jurisdiction, holding that possession of a ship, taken by a friendly

foreign power in the waters of another government, peaceably and without the exercise of force, involving neither breach of its peace nor other violation of the municipal laws of that government, is ineffective to support the foreign government's immunity.

"It is of course true that no foreign government may, in breach of our laws, or against our consent, exercise any act of sovereignty here. It is not true that a foreign government may not peaceably, and without breach of any of our laws, take physical possession of a ship of one of its nationals while in one of our ports" (p. 940).

In any event, when the steamship *Bosiljka* reached the high seas it was freed from any restraint concerning the exercise of sovereign power. (*The Navemar*, 102 Fed. Rep. [2d] 444.)

It is to be noted, therefore, that the property to which title is claimed by Yugoslavia was reduced to its possession outside of our jurisdiction, and without violation of the laws of nations or of those of the country where the seizure took place. Under these circumstances, it would seem that the seizure should have the same force and effect as if it had been accomplished within the territorial limits of a nation. Our courts have refused to inquire into the legality or propriety of such seizures. (See *Oetjen* v. *Central Leather Co.*, 246 U. S. 297; *Salimoff & Co.* v. *Standard Oil Co.*, 262 N. Y. 220.)

But, even if we assume that, because the requisition took place in Brazil, the Yugoslav Government must show that it acted in conformity with law, we think that this requirement has been satisfied. The law applicable would be the rules of international law relating to the sovereign powers of governments, not any particular statutory authority of Yugoslavia.

Having determined that a valid requisition for a proper military objective took place, we fail to see why the expressed intention made thereafter of preserving any fund which might be collected from the sale of the property, would deprive Yugoslavia of title to the requisitioned property, or create any attachable interest in a former owner.

The parties concede that under the fundamental law of Yugoslavia that government became liable to pay adequate compensation for the requisitioned property. In view of this liability, any method which the sovereign adopted to secure equitable adjustments of all claims might well be for the purpose of protecting that government from the possibility of double liability.

In the hands of a private person, the expressed intention of preserving the proceeds of the sale for the benefit of claimant

might, at most, create a trust for that purpose. Assuming that the Royal Yugoslav Government would be deemed such a trustee, we think that its sovereign immunity would protect it from any action by our courts to enforce such a trust, or to require the application of its property for a particular purpose. It has been held that a contract of a sovereign that its property shall be applied on a particular debt cannot be enforced by our courts, for such an agreement was said to amount to nothing more than an engagement of honor. (*Lamont* v. *Travelers Ins. Co.*, 281 N. Y. 362.) The intention of the government as to the fulfillment of a public purpose is not to be hindered by the claims of attaching creditors.

We might well rest here but for the fact that the claim of the government has been placed to some extent on the existence of a statute of Yugoslavia, which it claims vested title in it of all the property of its nationals. It appears that in 1931 a statute was passed in Yugoslavia known as the " Law Concerning the Organization of the Army and Navy." Among other provisions of this law was one which read as follows: "In emergency, mobilization and war statuses for the defense of the country and the conduct of the war, the military authorities have at their disposal the whole military strength, the entire nation and all financial, economic, industrial and all other material resources of the country and of its citizens. Details relating to the matters herein mentioned are subject to regulation by Royal decree."

Concededly, a status of war existed at the time of the present seizure. It would seem clear, therefore, that at said time all material resources of Yugoslav nationals were at the disposal of the government. But, even if we deem that this statute is not self-executory in so far as vesting title of the property of nationals in the government is concerned, we think that this is immaterial, because the claim here is one of requisition and not the vesting of title pursuant to a foreign decree. In this respect the case differs somewhat from *Anderson* v. *N. V. Transandine Handelmaatschappij* (289 N. Y. 9). There the question involved was the effect of a foreign decree which in and of itself vested title in a friendly sovereign power to the property of its nationals wherever situated. The decision in the *Anderson* case (*supra*) is a precedent here, however, to the extent that it holds that recognition of title legally conferred on a foreign government pursuant to recognized rules of international law will not offend our public policy as to property having a situs here. If this is so as to title acquired by foreign decree, it would seem to apply with greater force to property requisitioned and in the actual

possession of the foreign government, if at least such property was acquired in accordance with the recognized law of nations. (Hyde on International Law, § 256; *The Attualita,* 238 Fed. Rep. 909.)

Plaintiff points out, however, that if this be a case of requisition, certain requirements of the Requisition Law adopted in Yugoslavia on December 28, 1939, were not complied with. The statute referred to contains numerous provisions concerning the details of steps to be taken in connection with requisitions to be made by the Yugoslav Government. We think that the law referred to was primarily intended to apply to requisitions taking place within the territorial limits of Yugoslavia. It is to be remembered further that at the time of the present requisition the Royal Yugoslav Government was in flight, and, thus, it was difficult, if not impossible, for some of the statutory requirements to be met. A reading of the statute would indicate that it was not intended to apply to seizures in foreign ports, for undoubtedly it was recognized that international law would apply in such cases.

As we have heretofore pointed out, the failure to comply with the requirements of any of its own internal statutes may not be used by the municipal courts of another country as the basis for questioning the propriety of the actions of a sovereign power. Assuming, however, that we are in error in this regard, it is clear that this statute did not deprive the Royal Yugoslav Government of its inherent prerogative to requisition a vessel flying its flag, with its cargo, in order to prevent them from falling into the hands of the enemy.

In view of our finding that a valid requisition took place, which vested title to the 963 bales of cotton in the Yugoslav Government, we feel bound by the rules of comity applicable to the property of a friendly nation, to hold that this cotton is free from attachment.

The order should be reversed with twenty dollars costs and disbursements, and the motion to vacate the levy under the attachment granted.

MARTIN, P. J., and GLENNON, J., concur; TOWNLEY and COHN, JJ., dissent and vote to affirm.

Order reversed upon questions of fact and of law with twenty dollars costs and disbursements to the appellant, and the motion to vacate the levy under the attachment granted. Settle order on notice.