### KANE v. NATIONAL INSTITUTE OF AGRARIAN REFORM.
No. 61 L 730.

Circuit Court, Dade County.
June 8, 1961.

Taylor & Bergstresser, Miami, for plaintiff.

Hilton R. Carr, Jr., Sam Daniels, Kelly, Paige & Black, all of Miami, for defendant.

HAL P. DEKLE, Circuit Judge.

This cause is before the court after arguments and briefs on the motion for summary judgment of the defendant National Institute of Agrarian Reform, which is the acknowledged official agency of the present government of Cuba, urging on the same basis asserted in its motion to dismiss, earlier denied, that there can be no liability as to this defendant because of what is known as the Act of State Doctrine or as sometimes termed, Foreign Acts Doctrine, which was recognized by the United States Supreme Court in Underhill v. Hernandez, 168 U.S. 250, 18 S. Ct. 83, 42 L. Ed. 456; Oetjen v. Central Leather Co., 246 U.S. 297, 38 S. Ct. 309, 62 L. Ed. 726; and Ricaud v. American Metal Co., 246 U.S. 304, 38 S. Ct. 312, 62 L. Ed. 733.

Under the Act of State Doctrine the courts of one country will not sit in judgment on the acts of a foreign sovereign within such other country's own territory.

The foreign act here involved was the confiscation ("compulsory expropriation") by the Cuban government of plaintiff's entire business and property in Cuba.

This cause began by way of attachment of certain personal property belonging to the defendant and located in Dade County, Florida, and service thereby obtained.

The Underhill case in 1897 involved an American citizen seeking damages from a Venezuelan general for his detention, confinement and assaults committed by the general's soldiers in Bolivar, Venezuela. The other two cases involved Mexican seizures of American properties in Mexico by famed revolutionaries, General Poncho Villa and General Pareyra.

The reasoning of the Underhill decision follows in part — "If the party seeking to dislodge the existing government succeeds, and the independence of the government it has set up is recognized, then the acts of such government, from the commencement of its existence, are regarded as those of an independent nation." The reasoning is based on the idea of a successful upheaval or revolution which brings about a new government whose prior acts in attaining success will be recognized as the legitimate acts of a recognized government, such government having thereafter been recognized.

In the two Mexican seizure cases, likewise during the course of a revolution, our U. S. Supreme Court gave recognition to the doctrine, saying in the Ricaud case, supra — "The fact that the title to the property in controversy may have been in an American citizen, who was not in or a resident of Mexico at the time it was seized for military purposes by the legitimate government of Mexico, does not affect the rule of law that the act within its own boundaries of one sovereign state cannot become the subject of re-examination and modification in the courts of another. Such action when shown to have been taken, becomes, as we have said, a rule of decision for the courts of this country . *Whatever rights such an American citizen may have can be asserted only through the courts of Mexico or through the political departments of our government . . .*" (Italics added.)

In Ricaud the issue was not directly raised so that the language is no more than dicta in any event, but it seems significant that the premise for the doctrine presupposes a right available in the courts of such newly formed government — a supposition which it appears is not present here.

The same is true upon examination of the opinion by Justice Learned Hand in Bernstein v. Van Heyghen Freres Societe Anonyme (2nd Cir., 1947), 163 Fed. 2d 246, cert. den. 332 U.S. 772, involving Nazi confiscation of property of Jews (in that case by execution of property transfer under duress). There, recognition of the Act of State Doctrine is based upon the fact that after cessation of hostilities the declaration issued by the allied governments including our own, took cognizance of such claims and set up the machinery under the military government for determination as a part of the final settlement in Germany.

Similar is the background in Pasos v. Pan American Airways (2nd Cir. 1956), 229 Fed. 2d 271. Ready remedies were available under the long established government of Nicaragua.

United States v. Belmont, 301 U.S. 324, 57 S. Ct. 758, 81 L. Ed. 1134, cited by defendant, turns on an international compact which determined the rights involved and with which the courts would not interfere. United States v. Pink, 315 U.S. 203, 62 S. Ct. 552, 86 L. Ed. 796, involved an unsuccessful attempt to give extraterritorial effect to a foreign decree, so is not applicable.

Before the court can grant defendant's motion for summary judgment, recognizing the Act of State Doctrine, the court must necessarily determine that a remedy exists through the courts or government of Cuba. The established courts of Cuba, however, have been abolished, and civil remedy is nonexistent — according to undisputed affidavits in the file.

The affidavit of Dr. Elio Rena Alvarez, a native and lifelong resident of Cuba until May, 1960, until which time he served as judge in the highest tribunal of the province of Havana, the equivalent of the Supreme Court of the United States, follows, in part — "That there is in truth and fact no laws in open courts, no forums for judicial determination, no right of litigation or no constitutional guarantees presently existing on the island of Cuba;" * * * "That the Supreme Court of Cuba is now in exile and has publicly declared and unanimously endorsed that the present government of Cuba, as such it may be called under the domination of Fidel Castro, is illegal and usurpius and without legal or legitimate authority."

The same affidavit sets forth on personal knowledge that Premier Fidel Castro publicly pledged at the outset of his regime to follow the constitution of Cuba of 1940, and that he took power in accordance with such pledge, but that upon his acquisition of power abrogated all provisions of such constitution, which included a provision that it could not be modified without a referendum of the people, and further in article 24 thereof that no property could be taken without judicial process and cash indemnification paid prior to the taking of such property — none of which of course has been the case. We know that by Premier Castro's own recent pronouncement of May of 1961, he has declared his government of Cuba as a socialist state.

To me the Act of State Doctrine must of necessity be reciprocal. All of the reasons cited for it support such idea. The action of the Cuban government and the premise expressed in the Cuban decree of seizure, hereafter quoted, obviously precludes any reciprocity. It seems apparent that the reasons existing for prior holdings under the doctrine do not exist in this instance.

There is a further reason why such doctrine cannot be applied here. Defendant significantly cites at the outset of its brief as follows — "All civilized nations follow this settled *principle of international law* for reasons of self-preservation and high expediency. Any other rule would lead to complete international chaos." (Italics added.)

If this is the basis of the application of the doctrine, then the premise on which it is founded falls. The United States State Department has by formal note delivered to the Cuban government declared the very nationalization law under which plaintiff's property was seized in Cuba to be in violation of international law. 43 Department of State Bull. 171 (1960). For notes by the United States Government declaring other recent Cuban nationalization measures to be violative of international law, see 42 Department of State Bull. 153 (1960) ; 43 Id. 141 (1960).

If application of the Act of State Doctrine is *dependent upon compliance with international law*, then its obvious breach removes the underpinning, and the doctrine cannot be applied in such a case. In Bernstein, supra, Justice Learned Hand further stated (p. 251) — " . . . the only relevant consideration is how far our Executive has indicated any positive intent to relax the doctrine that our courts shall not entertain actions of the kind at bar; . . . "

U. S. State Department telegram of April 13, 1961, filed before me states — "Effect in U. S. of decrees, etc. of Castro regime is question for court in which case heard." This seems adequate "positive intent to relax the doctrine" sufficient for our courts to "entertain actions of the kind at bar" without embarrassment to the Executive.

In Underhill, supra, the remedy which was suggested at page 85, was that — "redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." Patently, this remedy does not exist between the present Cuban "socialist state" and the United States of America.

The very recent case of Banco Nacional de Cuba v. Peter L. F. Sabatino as Receiver, et al, U.S. Dist. Ct. Sou. Dist. of N.Y., March 31, 1961, no. 26,794, is apparently a case of first impression on the proposition that the Foreign Acts, or Act of State Doctrine, will not be applied if the act in question is in violation of international law. Numerous citations are contained in that opinion and footnotes indicating that certain foreign forums have evidenced a willingness to examine the validity of foreign acts under international law in connection with the recognition thereof.

This recent Bank of Cuba case recites that the doctrine has its source in our conflict of laws principles and is thus a self imposed restraint. The learned District Court Judge D. J. Dimock then reasons that if one were to suppose a requirement of international law that a state afford full faith and credit to the acts of another state, such requirement would not extend to an act of state which was in violation of international law — in other words it would violate the very legal basis for its existence. Judge Dimock's opinion then continues —

"The basis for such recognition and respect vanishes, however, when the act of a foreign state violates not what may be our provincial notions of policy but rather the standards imposed by international law. This attitude implied in the exercise of the power of excluding foreign law which violates

international law is itself of significance. It demonstrates that however great the respect of courts for the official acts of foreign states may be, that respect is limited by the overriding concern for the authority of international law. Morgenstein, Foreign Acts Contrary to International Law, 4 Int'l.Q. 326, 344 (1951).

"There is an end to the right of national sovereignty when the sovereign's acts impinge on international law. Judicial refusal to inquire into the validity of an act of a foreign state has also been due to a desire not to embarrass the Executive in its conduct of foreign relations. See Bernstein v. Van Heyghen Freres S.A., 2 Cir., 163 Fed. 2d 246, cert. den. 332 U.S. 772. The United States State Department has, however, delivered a note to the Cuban Government declaring the very nationalization law which plaintiff seeks to enforce to be in violation of international law. It can scarcely be believed therefore that judicial examination of the decree in the light of international law would embarrass the Executive. * * *

"Courts of this country have the obligation to respect and enforce international law not only by virtue of this country's status and membership in the community of nations but also because international law is a part of the law of the United States, see The Pacquete Habana, 175 U.S. 677, 700; U.S. Cons. Ary. 1, #8, cl. 10; 1 Oppenheim, International Law 41-2 (8th ed., Lauterpacht, 1955)."

As heretofore mentioned the act in question has already been declared by our State Department to be in violation of international law. Aside from such declaration, however, it would take no great mental exertion to recognize that it is thus violative. The recitals portion of the Castro executive decree, Resolution No. 3 of October, 1960, provides as follows —

EXECUTIVE POWER — Resolution No. 3

WHEREAS: The imperialistic interests whose representatives are in the exercise of the government of the United States of America, in their purpose to resort to all means they may deem efficacious to prevent the consolidation of the Cuban Revolution, have continued their increasingly unscrupulous and criminal aggressions against the economy of the nation.

WHEREAS: Among the various measures adopted by the Government of the United States of America there stands out for its exceptional aggressiveness the general embargo on exports from said country to Cuba with the intention to strangle our economy.

WHEREAS: Said measure, in addition to violating the most elemental principles of international coexistence, constitutes an act of political coercion, in vain designed to weaken the popular strength of the Cuban Revolution by creating difficulties to the Nation's normal supply.

WHEREAS: It is evident that this policy of the United States Government reveals that the despair and impotence of imperialism leads said Government to employ with increasing virulence the most iniquitous methods of aggression against our country.

WHEREAS: It is the duty of the Revolutionary Government to defend the economy of the country.

WHEREAS: The liquidation of American enterprises, commercial or industrial, which now constitute the residue in our nation of the financial capital of said country, is also fundamental for the economic liberation and development of our country.

——————— THEREFORE: ———————

In the use of the powers vested on us in conformity with the provisions of Law No. 851 of July 6, 1960.—

——————— WE RESOLVE: ———————

FIRST: To decree the nationalization through compulsory expropriation and, in consequence, the adjudgment in favor of the Cuban State, in fee simple, of all properties and enterprises located in the national territory, and the rights and rights of action arising from the exploitation thereof which are the property of natural or juridical persons who are nationals of the United States of America or those who operate enterprises in which nationals of said country have a predominant interest. * * *

Expropriation of plaintiff's property consisting of tractors, farm implements and the like was not reasonably related to a public purpose involving the use of such property. See Anglo-Iranian Oil Co., Ltd. v. S.U.P.O.R. Co., Italy Civil Court of Rome (1954), 1955 Int'l. Rep. 23, 42, — "The Italian courts must refuse to apply in Italy any foreign law which decrees an expropriation, not for reasons of public interest but for purely political, persecutory, discriminatory, racial and confiscatory motives"; McNair, The Seizure of Property and Enterprises in Indonesia, 6 Netherlands Int'l. L. Rev. 219, 243-47 (1959).

The taking of such property cannot be said to be justified on the ground of requirement for some legitimate purpose of government or that a transfer of ownership was necessary for the security, defense or social good of the state. The taking was admittedly in retaliation for acts by the government of the United States as contained in the above recitals and was totally uncon-

nected with the subsequent use of it in being nationalized. This fact alone is sufficient to render the taking violative of international law.

Likewise such expropriation is contrary to standards of international law as being discriminatory. See, e.g., Anglo-Iranian Oil Co., Ltd. v. S.U.P.O.R. Co., supra; 6 Netherlands Int'l. L. Rev. 219, at 247-49; Doman, Postwar Nationalization of Foreign Property in Europe, 48 Colum. L. Rev. 1125, 1130 (1948).

Nationals of the United States only are affected and there appears no reasonable basis for such a classification; neither is it justified on the basis of any conduct of the owners in their management of the properties or importance to the security of the State. The decree in plain language uses simple reprisal against another government as the reason. See Czechoslovak Confiscatory Decree case (American Zone) Court of Appeals of Nuremberg, Germany (1949), 1949 Ann. Dig. 25 (No. 14) (referring to the principle of international law that "no person can be deprived of his property solely on the ground of his nationality") ; Anglo-Iranian Oil Co., Ltd. v. S.U.P.O.R. Co., supra — "Discriminatory laws, enacted out of hatred, against aliens or against persons of any particular race or category or against persons belonging to specific social or political groups cannot be applied in Italy because they run counter to the initially accepted principle of the equality of individuals before the law."

It may be further noted that the nationalization measure in question does not provide adequate compensation for taking of the properties. As to the requirement of adequate compensation see, e.g., 3 Hackworth, Digest of International Law 653-65 (1943) ; Harvard Convention on the International Responsibility of States for Injuries to Aliens, Article 10 (Draft No. 11, (1960) ; 1 Oppenheim, International Law 351-54 (8th ed. Lauterpacht, 1955).

Defendant's counsel adroitly argues that the express holding in the Bank of Cuba case was in a situation where, as the court there pointed out, the Cuban agency, National Bank of Cuba, was seeking affirmative relief as the plaintiff and the court there held that our courts would not lend themselves to the *enforcement* of such a confiscation decree. I do not find this to be a valid distinction. It is aid, none the less, whether sought affirmatively or asserted as a defense to avoid or block an otherwise valid claim against it, using the same reason. One cannot be heard to say — "You need not assist us with carrying out a wrong but you cannot invoke the same principle to avoid the result of it."

124

It is interesting in this respect to note that the recovery sought in this case is in one count, upon an account receivable from the defendant itself. Upon confiscation of all assets including such account receivable the defendant suggests that it cannot now be sued on account thereof — because the defendant now holds its own account receivable!

Defendant's motion for summary judgment is accordingly denied.