TROTT, Circuit Judge,
concurring:
I agree with my colleagues’ resolution of this case and our per curiam opinion. I write separately only to augment the background material that demonstrates that the Plaintiffs’ complaint raises nonjusticia-ble political questions, thus depriving us of jurisdiction to entertain it.
To illustrate the direct foreign policy interests of the United States that envelop every aspect of Plaintiffs’ case, I turn to relevant excerpts from the testimony and presentation on April 10, 2002, of Marc Grossman, our State Department’s Undersecretary for Public Affairs. He delivered this testimony to a Subcommittee of the Committee of Appropriations of the House of Representatives in connection with an appropriation of funds for fiscal year 2003, requested by President George W. Bush. In Subcommittee Chairman Kolbe’s opening statement, he set the stage for the undersecretary’s testimony:
One could have predicted a heated debate last year about our policy in Colombia, but no one could have imagined the developments that have led us to where we are here today. After nearly four years of fruitless and one-sided negotiations, President Pastrana called off *556 the peace process a few weeks ago. I sympathize with the frustration that President Pastrana expressed at that time and the frustration of the Colombian people for this failed attempt to negotiate a settlement to a 40-plus year conflict given the FARC’s mockery of the peace negotiations by their continued kidnapping and bombing.”
Foreign Operations, Export Financing, and Related Programs Appropriations for 2003: Hearing Before the Subcomm. on Foreign Operations, Export Financing, and Related Programs of the Comm, on Appropriations, 107th Cong. 271-272 (2002).
Undersecretary Grossman then explained, in oral testimony and a written statement, our purpose and policy in seeking this appropriation from Congress.
For me, this comes down to one thing, which is that Colombia matters to the United States. Congress has been a key partner in our efforts to help Colombia defeat the demons that it now confronts in narco-trafficking, underdevelopment, human rights abuses and terrorism....
As Chairman Kolbe said, on March the 21st, we came here and proposed, through a supplemental, some changes in law and regulation. We did that because we have come to believe, as Chairman Kolbe said, that the problems of narcotics and terrorism in Colombia are connected. And exactly as the Chairman said, we seek these new authorities because we believe that we can do a better job.
Mr. Chairman, I think it is very important to take an overview here on what we are trying to accomplish in Colombia, which is a hemispheric vision of democracy, prosperity and security. I will not go into it in great detail, but you all know that in Quebec last year 34 heads of state and governments of this hemisphere got together and did two very important things.
First of all, they passed a democracy clause which said that all countries in this region to be part of the conversation in the Western Hemisphere ought to be democracies.
Second, they discussed an improved action plan to promote economic prosperity, protect human rights, fight drug trafficking and organized crime. Additionally, they also set 2005 as a deadline for the Free Trade Area of the Americas.

Democracy, security and prosperity. It seems to me that the question we have to ask ourselves is, what good are all these principles if they get trampled in Colombia.

... The FARC has killed six Colombian legislators and kidnapped presidential candidate Ingrid Betancourt. Groups assassinated 12 mayors in 2001, and the FARC efforts to disrupt the March 10 legislative elections are also well documented.
I also believe that there is an assault on Colombia’s prosperity as well. The ELN and FARC bombings of the key Caño Limón oil pipeline cost the government of Colombia almost $500 million in lost revenue last year.
... I just wanted to say that, we think we have got a hemisphere consensus on security, prosperity and democracy and that these principles really are under attack in Colombia. They are under attack in terms of Colombia’s democracy, on security and I would say also — on the Caño Limón pipeline — that there is *557 an assault by the FARC, the ELN and the [United Self-Defense Forces of Colombia (“AUC”) ] on Colombia’s prosperity.
As I was saying, Mr. Chairman, the ELN and FARC bombings of this oil pipeline cost the government of Colombia about $500 million a year, which is equal to about one-third of Bogota’s spending on health for its citizens. FARC strikes against the country’s power grid in February left 45 towns, including two departmental capitals, without electricity for days. The FARC also attempted twice to blow up dams near Bogota, and had these efforts not been stopped, we believe they would have killed thousands and thousands of Colombians.
Finally, we have the question of this assault on Colombia’s security. The terrorist attacks in Colombia have resulted in over 3,000 Colombians killed in the year 2001. Another 2,856 were kidnapped with ELN, FARC, and AUC responsible for almost 2,000 victims. Again, I show you a chart, over the years, on kidnapping in Colombia.
Since July of 2000, the United States has provided Colombia with $1.7 billion to combat narcotics trafficking, terrorism, strengthen democratic institutions and human rights, foster socioeconomic development and mitigate the impact of violence on Colombian civilians.
[T]he government of Colombia has extradited 23 Colombian nationals to the United States in 2001; an unprecedented level of cooperation, and I draw your attention to that chart on extraditions. And I believe that the reason we have had this increase in extraditions is the increased engagement we have had with Colombia.
We are also helping municipalities increase their ability to manage their policies and their funds. We are working closely with the prosecutor general’s office to set up human rights units throughout the country to facilitate the investigation and prosecution of human rights abuses. Furthermore, the prosecutor general, as many of you know, was here a couple of weeks ago, and we had a chance to talk to him about the progress we are making in that area as well.
As I was reporting to Mrs. Lowey, last week the chief of the Army staff, General Shinseki, and General Speer, went to the highest levels of the military and said that, “Human rights must, must, must be among the most important of your calculations as you move forward.” And I believe, Mr. Chairman, it is right to say that our human rights message is making a real difference.
The Colombian military captured 590 paramilitary members last year and killed 92 members in combat. Eight military personnel, including two colonels and a lieutenant colonel, were charged in civilian courts with collaborating, with paramilitaries or committing gross human rights violations in 2001, and that list goes on.
Still, too many Colombians continue to suffer abuses by state security forces or by terrorist groups acting in collusion with state security units, and those responsible must be punished.
Expanding the authorities for the use of aircraft and other assets to cover terrorist and other threats to Colombian democracy will, of course, not ensure that this battle will be won, because they are working against multiple threats. *558 However, we believe that if you approve ths proposition, they will give us the flexibility we need to help the government of Colombia more efficiently and more effectively attack the problems that they face.
The FARC and ELN also represent a danger to the $4.3 billion in direct U.S. investments in Colombia. They regularly attack U.S. interests, including the railway used by the Drummond Coal Mining facility and Occidental Petroleum’s stake in the Caño Limón Pipeline. Terrorist attacks on the Caño Li-món pipeline also pose a threat to U.S. energy security. Colombia supplied 3% of U.S. oil imports in 2001, and possesses substantial potential oil and natural gas reserves.

Our request for new authorities does not signify a retreat from our concern about human rights nor signal an ill-guided U.S. commitment in Colombia. Our proposal expressly states that we will continue to do human rights vetting of all Colombian military units receiving U.S. training or equipment and will maintain the 800 person cap on U.S. military personnel and contractors providing training and other services in Colombia.

In the longer-term, we are asking for $439 million in [International Narcotics Control and Law Enforcement (“IN-CLE”) ] funds in our FY-03 budget request to sustain our Plan Colombia programs, as well as $98 million in [Foreign Military Financing (“FMF”) ] funds to train and equip Colombian military units protecting the Caño Limón oil pipeline. The $439 million request includes $275 million for the Colombian military and police, and $164 million for democracy programs, alternative development, assistance to vulnerable groups, and promotion of the rule of law. These funds, together with the terrorism supplemental, will be crucial as the next Colombian government works to improve security, build effective democratic institutions, and foster economic growth.
107th Cong. 273-278 (Grossman Testimony), 284-290 (Grossman Statement) (emphasis supplied).
Peter Rodman, assistant secretary of defense for international security affairs, then provided the Subcommittee with the Defense Department’s perspective on the United States’ involvement in Colombia:
Continuing to link U.S. Aid to Colombia to a narrow counternarcoties focus means that, by law, we must refrain from providing Colombia certain kinds of military assistance and intelligence support that could immediately strengthen the government’s position throughout the country. Hundreds of attacks by the ELN and FARC have been directed at electrical, natural gas and oil infrastructure. As Ambassador Grossman has noted, the guerrillas’ sabotage of oil pipelines alone has cost the Government of Colombia lost revenue on the order of $500 million per year. The pipeline was bombed 170 times in 2001, spilling 2.9 million barrels of oil — eleven times the amount of the Exxon Valdez.
The Administration has proposed to Congress $6 million in FY02 supplemental funding and $98 million in FY03 Foreign Military Finance funding to train and equip vetted Colombian units to protect that country’s most threatened piece of critical economic infrastructure- — -the first 170 kilometers of the Cano-Limon oil pipeline. This segment is the most often attacked. U.S. assistance and training will support two Colombian Army Brigades, National Po *559 lice and Marines operating in the area. These units through ground and air mobility will be in a better position to prevent and disrupt attacks on the pipeline and defend key facilities and vulnerable points such as pumping stations. These units will also send a message that the Colombian State is committed to defending its economic infrastructure — resources that provide sorely needed employment and revenue — from terrorist attacks.
Basic security throughout Colombia’s national territory is the essential but missing ingredient. The Pastrana administration’s Plan Colombia was an admirable start toward resolving Colombia’s interrelated problems, of which the security component is only one part. But there can be no rule of law, economic development and new job creation, strengthening of human rights or any other noble goals, where there is no basic security.
Therefore, our policy in Colombia should augment traditional counterdrug programs with programs to help Colombia enhance basic security. A friendly democratic government in our hemisphere is struggling to preserve its sovereign authority under assault from extremists of both left and right. U.S. policy towards Colombia requires a bipartisan consensus at home for a long-term strategy aimed at strengthening Colombia’s ability to enforce effective sovereignty and preserve democracy. The new and more explicitly legal authorities that the Administration is proposing are intended to serve these goals.
107th Cong. 303-04 (emphasis supplied).
Major General Gary Speer, acting commander in chief of the United States Southern Command, provided the Subcommittee with a written statement on the appropriations, which included the following:
In addition to counterdrug assistance, the Administration has proposed to Congress $98 million, for FY 2003, to help Colombia to enhance the training and equipping of units to protect the Caño Limón-Covenas oil pipeline, one of the most vulnerable elements of their economic infrastructure. The FARC and ELN are active in carrying out attacks against Colombia’s energy infrastructure. Attacks on the Caño Limón-Cove-nas pipeline cost the Government of Colombia more that $40 million per month in revenues when the pipeline is not operational. During the past year, the pipeline was offline for more than 266 days. In addition, the amount of oil spilled during these attacks is eleven times greater than the Exxon Valdez spill, creating significant environmental damages.
The Administration has included $6 million in the FY 2002 Supplemental to begin training. The first unit to be trained for this program with be the recently human rights vetted, Arauca-based Colombian Army 18th Brigade. Subsequent units to be trained for infrastructure security include the 5th Mobile Brigade, designated Colombian National Police units, and Colombian Marines. The Colombian units will also be equipped with weapons and ammunition, vehicles, night vision devices, and communications equipment, as well as a helicopter tactical lift capability for a company-sized quick reaction force.
If approved, this training will assist the Colombians to exert effective sovereignty in the Arauca Department, where those attacks primarily occur. Through a comprehensive strategy of reconnaissance and surveillance, offensive and quick reaction operations, the Colombian military will be better able to mitigate *560 the debilitating economic and financial effects of constant attacks on critical infrastructure.
107th Cong. 345 (emphasis supplied).
After this hearing, the Subcommittee submitted a written question to Undersecretary Grossman: “Why would the Administration choose to fund the training of the Colombian military to protect an oil pipeline that is owned in part by Occidental Petroleum?” 107th Cong 390. This was Undersecretary Grossman’s response:
The most significant factor in developing the Caño Limón pipeline initiative was the revenues and royalties it generates for Colombia, not its part-ownership by Occidental Petroleum. It is in the U.S. national interest to help Colombia’s democratic government generate resources to meet pressing social, developmental, and security needs. In 2001, the pipeline was attacked 170 times, causing it to be shut down for over 200 days and costing Colombia nearly $500 million in foregone revenues and royalties.
The proposed training and equipment of Colombian army, police and marine units will also serve as a model for Colombia as it develops additional programs to protect key infrastructure. Moreover, while Colombia does export some oil to the United States, its potential has not been fully developed, in large part because the security situation discourages investment. Finally, reducing attacks against the pipeline will lessen the serious environmental damage they cause.
107th Cong. 390-91 (emphasis supplied).
In the United States Senate, before the Committee on Foreign Relations on February 6, 2003, the State Department’s witness on our foreign affairs budget for 2004 was. Secretary of State Colin L. Powell. Pertaining to the issues in this case, he stated as follows:
Mr. Chairman, the 2004 budget proposes several initiatives to advance U.S. national security interests and preserve American leadership. The 2004 foreign operations budget that funds programs for the Department of State, USAID, and other agencies is $18.8 billion. Today, our No. 1 priority is to fight and win the global war on terrorism. The budget furthers this goal by providing economic, military, and democracy assistance to key foreign partners and allies, including $4.7 billion to countries that have joined us in the war on terrorism.
This budget also includes almost half a billion dollars for Colombia. The funding will support Colombian President Uribe’s unified campaign against terrorists and the drug trade that fuels their activities. The aim is to secure democracy, extend security, and restore economic prosperity to Colombia, and prevent the narcoterrorists from spreading instability through the broader Andean region.
The President’s request for $731 million for the Andean Counterdrug Initiative includes $463 million for Colombia. An additional $110 million in military assistance to Colombia will support Colombian President Uribe’s unified campaign against terrorists and the drug trade that fuels their activities. The aim is to secure democracy, extend security, and restore economic prosperity to Colombia, and prevent the narcoter-rorists from spreading instability through the broader Andean region. Critical components of this effort include resumption of the Airbridge Denial program to stop internal and cross-border aerial trafficking in illicit drugs, stepped *561 up eradication and alternative development efforts, and technical assistance to strengthen Colombia’s police and judicial institutions.
Foreign Affairs Budget: Hearing Before the Comm. on Foreign Relations, U.S. Senate, 108th Cong. 12-13 (Powell Testimony), 19 (Powell Statement). (2003) (emphasis supplied).
To implement our policy of assisting Colombia, Congress appropriated $71 million in 2002 and 2003 to buy helicopters and related support for the 18th Brigade, and $28 million dollars to provide the 18th Brigade with equipment and training by U.S. Special Forces. The training by the U.S. Special Forces began in January 2003, though the helicopters were delayed until 2005. In a report requested by both the House of Representatives and the Senate, the United States Government Accountability Office (“GAO”) reported that:
U.S. Special Forces provided training and equipment for about 1,600 Colombian Army soldiers to improve their ability to act quickly in minimizing terrorist attacks along the . Caño Limón pipeline. In November 2002, a team of U.S. Special Forces traveled to Arauca to assess the area and determine the training needs of the Colombian Army. In January 2003, U.S. Special Forces started training in Arauca and planned for training to continue through December 2004. U.S. Special Forces focused on helping the Colombian Army take a more proactive and aggressive approach to defend the pipeline; regain control of the area around the pipeline; and prevent, interdict, and disrupt the insurgents before they attack the pipeline. Training included developing quick reaction capabilities, small unit tactics, planning and conducting operations, reconnaissance, collecting and analyzing timely intelligence, and medical support.
Of considerable significance in this case is the series of official certifications to Congress by the State Department that it had determined “that the Colombian Government and Armed Forces are meeting statutory criteria related to human rights and severing ties to paramilitary groups.” These certifications were required by law in order to obligate funds appropriated by Congress to the Colombian Armed Forces. Consolidated Appropriations Act of 2004, Pub.L. No. 108-199, § 563(a)(1), (3), 118 Stat. 3 (2004).
Secretary of State Powell issued the first of these positive certifications to Congress on September 24, 2004. Secretary of State Condoleezza Rice issued similar positive certifications to Congress in 2005, 2006, and 2007; and the State Department followed suit from 2008 through 2011, when this case began. These State Department human rights certifications stand in stark contrast to Plaintiffs’ complaint and theory of liability.
As illustrated by this background material, the Supreme Court’s authoritative statement in Oetjen v. Cent. Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918), controls the resolution of this case:
The conduct of foreign relations of our government is committed by the Constitution to the legislative and legislative [branches] ... and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.
As my colleagues demonstrate, the Plaintiffs’ complaint falls squarely within this prohibition.