OETJEN *v.* CENTRAL LEATHER COMPANY.

ERROR TO THE CIRCUIT COURT OF HUDSON COUNTY, STATE OF NEW JERSEY.

Nos. 268, 269. Argued January 3, 4, 1918.—Decided March 11, 1918.

The court notices judicially that the Government of the United States recognized the Government of Carranza as the *de facto* government of the Republic of Mexico, on October 19, 1915, and as the *de jure* government on August 31, 1917.

*Semble,* that the Hague Conventions, in view of their terms and international character, do not apply to a civil war, and that the regula-

tions annexed to the Convention of 1907 do not forbid such a military seizure and sale of private property as is involved in this case.

The conduct of our foreign relations is committed by the Constitution to the executive and legislative—the political—departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.

Who is the sovereign *de jure* or *de facto* of a foreign territory is a political question the determination of which by the political departments of the Government conclusively binds the judges.

When a government which originates in revolution or revolt is recognized by the political department of our Government as the *de jure* government of the country in which it is established, such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence.

Every sovereign State is bound to respect the independence of every other sovereign State and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

The principle that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court as to claims for damages based upon acts done in a foreign country, for it rests at last upon the highest considerations of international comity and expediency.

In January, 1914, General Francisco Villa, while conducting independent operations as a duly commissioned military commander of the Carranza Government, which had then made much progress in its revolution in Mexico, levied a military contribution and, in enforcing it, seized and sold some hides then owned and possessed by a citizen of Mexico. *Held*, that the act could not be reëxamined and modified by a New Jersey court in replevin.

87 N. J. L. 552, 704, affirmed.

THE cases are stated in the opinion.

*Mr. John M. Enright*, with whom *Mr. Oscar R. Houston* and *Mr. James D. Carpenter, Jr.*, were on the brief, for plaintiff in error.

*Mr. Eli J. Blair,* with whom *Mr. Frank H. Platt* was on the brief, for defendant in error.

MR. JUSTICE CLARKE delivered the opinion of the court.

These two cases involving the same question, were argued and will be decided together. They are suits in replevin and involve the title to two large consignments of hides, which the plaintiff in error claims to own as assignee of Martinez & Company, a partnership engaged in business in the city of Torreon, Mexico, but which the defendant in error claims to own by purchase from the Finnegan-Brown Company, a Texas corporation, which it is alleged purchased the hides in Mexico from General Francisco Villa, on January 3, 1914.

The cases were commenced in a Circuit Court of New Jersey, in which judgments were rendered for the defendants, which were affirmed by the Court of Errors and Appeals, and they are brought to this court on the theory, that the claim of title to the hides by the defendant in error is invalid because based upon a purchase from General Villa, who, it is urged, confiscated them contrary to the provisions of the Hague Convention of 1907 respecting the laws and customs of war on land; that the judgment of the state court denied to the plaintiff in error this right which he "set up and claimed" under the Hague Convention or treaty; and that this denial gives him the right of review in this court.

A somewhat detailed description will be necessary of the political conditions in Mexico prior to and at the time of the seizure of the property in controversy by the military authorities. It appears in the record, and is a matter of general history, that on February 23, 1913, Madero, President of the Republic of Mexico, was assassinated; that immediately thereafter General Huerta declared himself Provisional President of the Republic

and took the oath of office as such; that on the twenty-sixth day of March following General Carranza, who was then Governor of the State of Coahuila, inaugurated a revolution against the claimed authority of Huerta and in a "Manifesto addressed to the Mexican Nation" proclaimed the organization of a constitutional government under "The Plan of Guadalupe," and that civil war was at once entered upon between the followers and forces of the two leaders. When General Carranza assumed the leadership of what were called the Constitutionalist forces he commissioned General Villa his representative, as "Commander of the North," and assigned him to an independent command in that part of the country. Such progress was made by the Carranza forces that in the autumn of 1913 they were in military possession, as the record shows, of approximately two-thirds of the area of the entire country, with the exception of a few scattered towns and cities, and after a battle lasting several days the City of Torreon in the State of Coahuila was captured by General Villa on October 1 of that year. Immediately after the capture of Torreon, Villa proposed levying a military contribution on the inhabitants, for the support of his army, and thereupon influential citizens, preferring to provide the required money by an assessment upon the community to having their property forcibly seized, called together a largely attended meeting and, after negotiations with General Villa as to the amount to be paid, an assessment was made on the men of property of the city, which was in large part promptly paid. Martinez, the owner from whom the plaintiff in error claims title to the property involved in this case, was a wealthy resident of Torreon and was a dealer in hides in a large way. Being an adherent of Huerta, when Torreon was captured Martinez fled the city and failed to pay the assessment imposed upon him, and it was to satisfy this assessment that, by order of General Villa, the hides in controversy

were seized and on January 3, 1914, were sold in Mexico to the Finnegan-Brown Company. They were paid for in Mexico, and were thereafter shipped into the United States and were replevied, as stated.

This court will take judicial notice of the fact that, since the transactions thus detailed and since the trial of this case in the lower courts, the Government of the United States recognized the Government of Carranza as the *de facto* government of the Republic of Mexico, on October 19, 1915, and as the *de jure* government on August 31, 1917. *Jones* v. *United States,* 137 U. S. 202; *Underhill* v. *Hernandez,* 168 U. S. 250.

On this state of fact the plaintiff in error argues that the "Regulations" annexed to the Hague Convention of 1907 "Respecting Laws and Customs of War on Land" constitute a treaty between the United States and Mexico; that these "Regulations" forbid such seizure and sale of property as we are considering in this case; and that, therefore, somewhat vaguely, no title passed by the sale made by General Villa and the property may be recovered by the Mexican owner or his assignees when found in this country.

It would, perhaps, be sufficient answer to this contention to say that the Hague Conventions are international in character, designed and adapted to regulate international warfare, and that they do not, in terms or in purpose, apply to a civil war. Were it otherwise, however, it might be effectively argued that the declaration relied upon that "private property cannot be confiscated" contained in Article 46 of the Regulations does not have the scope claimed for it, since Article 49 provides that "money contributions" . . . "for the needs of the army" may be levied upon occupied territory, and Article 52 provides that "Requisitions in kind and services shall not be demanded . . . except for the needs of the army of occupation," and that contributions in kind shall, as far as possible, be

paid for in cash,. and when not so paid for a receipt shall
be given and payment of the amount due shall be made
as soon as possible. And also for the reason that the
"Convention" to which the "Regulations" are annexed,
recognizing the incomplete character of the results ar-
rived at, expressly provides that until a more complete
code is agreed upon, cases not provided for in the "Regu-
lations" shall be governed by the principles of the law of
nations.

But, since claims similar to the one before us are being
made in many cases in this and in other courts, we prefer
to place our decision upon the application of three clearly
settled principles of law to the facts of this case as we
have stated them.

The conduct of the foreign relations of our Government
is committed by the Constitution to the Executive and
Legislative—"the political"—Departments of the Gov-
ernment, and the propriety of what may be done in the
exercise of this political power is not subject to judicial
inquiry or decision. *United States* v. *Palmer*, 3 Wheat.
610; *Foster* v. *Neilson*, 2 Pet. 253, 307, 309; *Garcia* v. *Lee*,
12 Pet. 511, 517, 520; *Williams* v. *Suffolk Ins. Co.*, 13
Pet. 415, 420; *In re Cooper*, 143 U. S. 472, 499. It has
been specifically decided that "Who is the sovereign, *de
jure* or *de facto*, of a territory is not a judicial, but is a
political question, the determination of which by the
legislative and executive departments of any govern-
ment conclusively binds the judges, as well as all other
officers, citizens and subjects of that government. This
principle has always been upheld by this court, and has
been affirmed under a great variety of circumstances."
*Jones* v. *United States*, 137 U. S. 202, 212.

It is also the result of the interpretation by this court
of the principles of international law that when a govern-
ment which originates in revolution or revolt is recognized
by the political department of our government as the *de*

*jure* government of the country in which it is established, such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence. *Williams* v. *Bruffy,* 96 U. S. 176, 186; *Underhill* v. *Hernandez,* 168 U. S. 250, 253. See *s. c.* 65 Fed. Rep. 577.

To these principles we must add that: "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves." *Underhill* v. *Hernandez,* 168 U. S. 250, 253; *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347.

Applying these principles of law to the case at bar, we have a duly commissioned military commander of what must be accepted as the legitimate government of Mexico, in the progress of a revolution, and when conducting active independent operations, seizing and selling in Mexico, as a military contribution, the property in controversy, at the time owned and in the possession of a citizen of Mexico, the assignor of the plaintiff in error. Plainly this was the action, in Mexico, of the legitimate Mexican government when dealing with a Mexican citizen, and, as we have seen, for the soundest reasons, and upon repeated decisions of this court such action is not subject to reëxamination and modification by the courts of this country.

The principle that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court, such as we have here, as it was held to be to the cases cited, in which claims for damages were based upon acts done in a foreign country, for it rests at last upon the highest

considerations of international comity and expediency. To permit the validity of the acts of one sovereign State to be reëxamined and perhaps condemned by the courts of another would very certainly "imperil the amicable relations between governments and vex the peace of nations."

It is not necessary to consider, as the New Jersey court did, the validity of the levy of the contribution made by the Mexican commanding general, under rules of international law applicable to the situation, since the subject is not open to reëxamination by this or any other American court.

The remedy of the former owner, or of the purchaser from him, of the property in controversy, if either has any remedy, must be found in the courts of Mexico or through the diplomatic agencies of the political department of our Government. The judgments of the Court of Errors and Appeals of New Jersey must be

*Affirmed.*