**Emil ALPERIN, et al., Plaintiffs,**

v.

**VATICAN BANK, et al., Defendants.**

**No. C99–4941 MMC.**

United States District Court, N.D. California.

Jan. 3, 2003.

---

Thomas Dewey Easton, Law Offices of Thomas Dewey Easton, Bend, OR, K. Lee Boyd, Malibu, CA, for Plaintiffs.

Jeffrey S. Lena, Berkely, CA, John Niblock, for Defendant IOR.

Ronald Mallen and Joanna Opperman, Hinshaw & Culbertson, San Francisco, CA, for Defendant OFM.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

CHESNEY, District Judge.

Before the Court are two separate motions to dismiss plaintiffs' Third Amended Complaint ("TAC"), filed, respectively, by defendant Order of Friars Minor ("OFM") and defendant Istituto per le Opere di Religione ("IOR"). The matters came on regularly for hearing on May 25, 2001. Ronald Mallen and Joanna Opperman of Hinshaw & Culbertson appeared on behalf of defendant OFM. Jeffrey Lena and John Niblock appeared on behalf of IOR. Tom Easton of the Law Offices of Thomas Dewey Easton and K. Lee Boyd of Pepperdine University Law School appeared on the behalf of plaintiffs. Having considered the papers filed in support of and in opposition to the motions and the arguments of counsel at the hearing, the Court rules as follows.

## BACKGROUND

This case arises out of the atrocities committed during World War II at the behest of the Ustasha Regime ("Ustasha"), a Nazi puppet government that controlled the Independent State of Croatia ("Croatia") from 1941 through 1945 and occupied portions of the former Soviet Union along with German military forces. (*See* TAC ¶¶ 1, 43) The plaintiffs in this action are twenty-four individuals and four organizations. (*See* TAC ¶¶ 9–36.) The individual plaintiffs include victims of crimes against persons and property, and their descendants, currently residing in Europe and the United States.[1] The four organizational plaintiffs are (1) the Ukraine Organization of Ukrainian Antifascist Resistance Fighters, representing "8,500 former partisans and resistors of the Nazi occupation of Ukraine and concentration camp victims," (2) the Ukrainian Union of Nazi Victims and Prisoners, representing "over 300,000 former slave and forced laborers, prisoners, concentration camp, and ghetto survivors," (3) the Jasenovac Research Institute, a non-profit human rights organization and research institute "committed to establishing the truth about the Holocaust in Yugoslavia," and (4) the International Union of Former Juvenile Prisoners of Fascism, representing "Nazi victims in the former Soviet Union including Ukraine, Russia and Belarus." (TAC ¶¶ 33–36.)

Plaintiffs seek to represent "a class of all Serbs, Jews, former Soviet Union citizens (and their heirs and beneficiaries)," who suffered physical, monetary, and/or property losses or [were] forced into slave labor due to the systematic and brutal extermination of Jews, Serbs, and Romani by the Nazi puppet Ustasha Regime, and "as a result of the occupation of the Soviet Union by Croatian military forces in con-

1. The Court will not endeavor to set forth herein a detailed description of the events giving rise to each of the plaintiffs' claims, which events include murder under the most horrific of circumstances, imprisonment, forced labor, and looting.

cert with their German occupation forces." (TAC ¶ 62.)

Defendant OFM is a religious brotherhood founded by St. Francis of Assisi. (OFM Mem. at 1 n. 1.) Defendant IOR is a "special institute established and located within the Vatican City State for managing economic assets committed to it, and for administering those that serve to sustain works of religion and charity."[2] (Declaration of Father Daniel C. Conlin ("Conlin Decl.") ¶¶ 31–34.) The IOR was first constituted by Pope Leo XIII in the late 19th Century as the Commission for Charitable Causes ("Commission"), for the purpose of safeguarding and administering the capital of charitable institutions. (Piccolo Decl. Ex. E.) In 1941 and 1942, the "Commission" was transformed into what is currently known as the IOR, a "public juridical person"[3] created by chirographic[4] act of Pope Pius XII.[5] (Conlin Decl. ¶ 26; Piccolo Decl, Ex. C at 9, Exs. E, K.)

Plaintiffs allege that the IOR and OFM profited from the genocidal system instituted by the Ustasha by obtaining, accepting, concealing, and converting assets from the Ustasha treasury, which contained assets looted by the Ustasha during World War II. (TAC ¶ 2, 5.) Specifically, plaintiffs allege that, following the demise of the Ustasha Regime in 1945, members of the Roman Catholic clergy and the OFM assisted in the transfer of over 200 million Swiss francs from the Ustasha treasury to the IOR. (TAC ¶¶ 56, 60.) Plaintiffs further allege that the IOR thereafter helped transfer portions of the Ustasha treasury to Ustasha war criminals living abroad. (TAC ¶ 59.)

Plaintiffs also allege that the IOR and OFM "committed, conspired to commit, and aided and abetted others who committed crimes against humanity". (TAC ¶ 3.) Specifically, plaintiffs allege that during World War II, members of the Roman Catholic clergy and the OFM were "high officials" of the Ustasha government and that relations between the Vatican and Ustasha were "cordial." (TAC ¶¶ 54, 55.) Plaintiffs further allege that following the war, the IOR assisted Ustasha war criminals in evading justice through the transfer of funds and financial transactions involving banks in "various European and South American countries." (TAC ¶¶ 59, 60.) Plaintiffs allege that the OFM also assisted Ustasha war criminals evade justice, by providing them with money, hiding them on its properties, and operating a Nazi smuggling operation known as the "ratline." (TAC ¶¶ 38, 55.) Plaintiffs al-

---

2. The IOR's By–Laws provide the following:

> The purpose of the Institute is to provide for the custody and administration of personal and real property transferred or entrusted to the Institute by natural or legal persons for religious works or charity.
> The Institute therefore accepts assets whose destination, at least partial or future, is indicated by the preceding paragraph. The Institute can accept deposits from entities or persons of the Holy See and of the State of Vatican City.

(Declaration of Josephine Piccolo (Piccolo Decl.) Ex. K at 4.)

3. "Juridical persons," under Canon Law, are legal subjects capable of acquiring, retaining, administering, and alienating temporal goods according to the norms of ecclesiastical law. (Conlin Decl. ¶ 23.) "Public juridical persons" are those legal subjects which act pursuant to a mission received from hierarchical authority and who are closely governed by ecclesiastical authority. (Conlin Decl. ¶ 25.)

4. A Chirograph, in the Law of the Vatican City State, is a legal instrument by which the Pope expresses his sovereign will. (Conlin Decl. ¶¶ 8–9, 14.)

5. By a 1990 Chirograph, Pope John Paul II approved changes to the IOR's by-laws, retaining its name and purpose while "render[ing] the structures and the activities of the institute more adequate to the needs of the times." (Piccolo Decl. Ex. I.)

lege that both the IOR and OFM profited from these transactions. (TAC ¶ 60.)

On November 15, 1999, plaintiffs filed the complaint in this action. Following a series of motions to amend, stipulations of the parties, and orders of the Court, plaintiffs filed their Third Amended Complaint ("TAC") on August 30, 2000. Plaintiffs allege causes of action for conversion, unjust enrichment, human rights violations and violations of international law. They seek an accounting, restitution, disgorgement of profits, and compensatory and punitive damages. (TAC ¶¶ 80–97.)

Both the IOR and OFM move to dismiss on the grounds that (1) the case presents nonjusticiable political questions, (2) plaintiffs lack standing, (3) the statute of limitations has expired and (4) the court lacks personal jurisdiction. Additionally, the IOR has moved to dismiss under the "comity of nations" doctrine and on the ground that the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602, *et seq.*, bars plaintiffs' suit, and OFM has moved to dismiss on the ground that the Court lacks subject matter jurisdiction over plaintiffs' claims.

## DISCUSSION

As noted, defendants' motions are based on a number of legal theories, each independently supporting dismissal of plaintiffs' claims. Upon agreement of the parties, the Court limits its discussion to the issue of whether plaintiffs' claims should be dismissed under the political question doctrine.

### A. Overview of the Political Question Doctrine

"The political question doctrine holds that a federal court having jurisdiction over a dispute should decline to adjudicate it on the ground that the case raises questions which should be addressed by the political branches of government."

*Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424, 483–84 (D.N.J.1999) (citing *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Atlee v. Laird*, 347 F.Supp. 689, 701 (E.D.Pa.1972), *aff'd sub. nom. Atlee v. Richardson*, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973)). "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. at 210, 82 S.Ct. 691; *see Atlee v. Laird*, 347 F.Supp. at 692–700 (tracing evolution of political question doctrine). In essence, the doctrine limits the exercise of federal jurisdiction and forecloses judicial inquiry into matters whose resolution is committed to a coordinate branch of government. *See Baker*, 369 U.S. at 211, 82 S.Ct. 691.

The Supreme Court has identified the features that characterize a case raising a nonjusticiable political question:

[1] A textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S.Ct. 691. If any one of these factors is "inextricable from the case," the court should dismiss the case as nonjusticiable on the ground that it involves a political question. *See Baker*, 369 U.S. at 217, 82 S.Ct. 691.

It is well-established that "[t]he conduct of the foreign relations of our government

is committed by the Constitution to the executive and the legislative—'the political'—departments of the government; and the propriety of what may be done in the exercise of this political power is not subject to any judicial inquiry or decision." *See Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918).

"The political question doctrine distinguishes between cases encompassing foreign relations and those addressing purely domestic issues." *Iwanowa*, 67 F.Supp.2d at 484; (citing *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *Oetjen*, 246 U.S. at 302, 38 S.Ct. 309); *see Atlee*, 347 F.Supp. at 696, 701–03 (recognizing "critical distinction between political questions as they relate to purely domestic affairs and those relating to foreign affairs"). "Very different considerations" are involved in cases encompassing foreign relations. *Atlee*, 347 F.Supp. at 701. As one court has noted:

> First, the potentially relevant information in a foreign policy case comes from a multitude of sources—both domestic and foreign—and might, by sheer bulk alone, be unmanageable for a court. In addition, there is the very real possibility that the parties might not assemble all the data, in which case any attempt by the court to justify a decision on the merits of an issue having so profound an affect on the nation would be both difficult and unwise.... A second major element concerns the inherent inability of a court to predict the international consequences flowing from a decision on the merits.

*Id.* at 702. Thus, when the foreign relations of the United States are at stake, courts properly are more hesitant to intervene than when the internal operations of this country are involved. *See id.* at 701 (recognizing "the need for federal courts to move with extreme caution in the sensitive area of foreign policy").

Nevertheless, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211, 82 S.Ct. 691. Rather, courts should undertake a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, its susceptibility to judicial handling in the light of its nature and posture in the specific case, and the possible consequences of judicial action." *Id.* at 211–12, 82 S.Ct. 691.

**B. Application of the Political Question Doctrine**

■ Here, consideration of the factors identified in *Baker* suggests that plaintiffs' case must be dismissed.

**1. *Commitment of the issue to a Coordinate Political Department***

First, the history of the management by the political branches of claims arising out of World War II and the Holocaust reveals a long-standing foreign policy commitment to resolving such claims at the governmental level. *See, e.g., In re Nazi Era Cases Against German Defendants Litigation*, 129 F.Supp.2d 370, 382 (D.N.J.2001) (holding "long-standing foreign policy commitment to resolving claims arising out of World War II and the Holocaust at a governmental level" provides basis for dismissal under the political question doctrine). Consequently, courts generally have recognized that adjudication through private litigation of claims such as those presented here would both intrude upon matters committed to the political branches and reflect a lack of respect for the coordinate branches of government. *See Burger-Fischer v. DeGussa AG*, 65 F.Supp.2d 248, 282, 284–85 (D.N.J.1999) (holding class actions against German corporations nonjusticiable under political

question doctrine where plaintiffs alleged defendants participated in Nazi regime's looting of gold and personal property and in using and profiting from forced labor); *Iwanowa,* 67 F.Supp.2d at 485–86 (holding class action against German manufacturer and its American parent nonjusticiable under political question doctrine where plaintiffs sought compensation and damages for forced labor in manufacturer's factory during World War II).

Starting with the Potsdam Conference in 1945, the United States has been a party to numerous treaties and agreements addressing reparations to be paid as a result of actions taken during World War II.[6] *See Burger–Fischer v. DeGussa AG,* 65 F.Supp.2d 248, 266–272 (D.N.J.1999). These efforts by the executive branch have continued up to recent times. *See id.* (citing to 1995 "Princz Agreement" and "1996 Second Supplemental Social Security Agreement"). Such action at the governmental level reflects a firmly-established policy that claims arising out of World War II "be resolved through government-to-government negotiations." *See Iwanowa,* 67 F.Supp.2d at 486.[7] Indeed, in 1953, that policy was expressly declared by the State Department: "[R]eparations and other governmental claims relating to

World War I and II should more appropriately be dealt with in the context of a peace treaty or similar arrangement." *See* Memorandum 5882, John Foster Dulles, Secretary of State, to the President, April 4, 1953, enclosure 7(a) at 4; Memorandums for the President—April 1953; Entry 1260; General Records of the Executive Secretariat, 1948–1956 (Lot File 56D459); General Records of the Department of State, Record Group 59; National Archives at College Park, College Park, MD.

While acknowledging the extensive involvement of the executive branch in the resolution of claims arising from World War II, plaintiffs argue that various treaties and reparation agreements have no bearing on the issue presented here because the IOR is located in the Holy See, which was not a party to any treaty or reparations agreement. (*See* Pl.'s Opp. to IOR's Mot. to Dismiss at 23; Pl's Opp. to OFM's Mot. to Dismiss at 8.) The existence of a treaty with these specific defendants, however, is not dispositive. The question, rather, is whether plaintiffs' claims are the type of claims that have been committed to the political branches for resolution. *See In re Nazi Era Cases Against German Defendants Litigation,* 129 F.Supp.2d at 378 ("The question is not

6.   Treaties and agreements between the United States and former Axis powers immediately following the end of World War II include the Potsdam Agreement (1945), Paris Agreement (1946), Treaty of Peace with Italy (1947), Transition Agreement (1952–54), London Debt Agreement (1955). *See Burger–Fischer,* 65 F.Supp.2d at 265–269; *see also* Declaration of Joanna D. Opperman Ex.B.

7.   Plaintiffs attempt to distinguish the instant case from *Iwanowa* and *Burger–Fischer* on the ground that it is a "bank restitution case, not a reparations case." (*See* Pl's Opp. to OFM's Motion to Dismiss at 6.) This is a distinction without a difference. "Beginning with the Versailles Treaty concluding World War I, the term 'reparations' has been deemed to refer to 'all loss and damage to which ... Govern-

ments and their nationals have been subjected as a consequence of the war imposed on them.'" *Burger–Fischer,* 65 F.Supp.2d at 275 (citing Treaty of Peace Between the Allied and Associated Powers and Germany, June 28, 1919, Art. 231, I Bevans 43, 137038). Moreover, to the extent such a distinction may be recognized, it is of no assistance to plaintiffs here. As the IOR points out, plaintiffs' claims are more properly characterized as claims for reparations. (*See* IOR Reply at 9 n. 19.) Plaintiffs do not identify as having been converted by the IOR or OFM any personal property, such as a bank deposit or insurance policy, and the relief sought is almost identical to that sought by the plaintiffs in *Burger–Fischer. See Burger–Fischer,* 65 F.Supp.2d at 253–54.

whether Plaintiff's claims are barred by treaty, but whether his claims are such that they have been committed to the political branches for resolution. To find that they have not been would be to conclude that his claims are somehow distinct from every other type of claim arising out of World War II and that they have somehow been left open for judicial resolution.")

Here, in addition to the treaties and agreements referenced above, the executive branch has manifested its continuing commitment to resolving individual claims arising out of World War II by actively encouraging other nations, including the Vatican State, to open their archives for the purpose of addressing the recovery and restoration of stolen gold and other assets and, in particular, any such gold and assets contained in the Ustasha Treasury. (*See* Declaration of Jeffrey S. Lena Ex. C ["U.S. and Allied Wartime Postwar Relations and Negotiations with Argentina, Portugal, Spain, Sweden, and Turkey on Looted Gold and German External Assets and U.S. Concerns About the Fate of the Wartime Ustasha Treasury," June 1998 ("Eizenstat Report")].). One such effort, the 1997 London Conference on Nazi Gold, is described in detail by the State Department in the Eizenstat Report. As noted therein:

> In December [1997] the British government brought together 41 countries and the Vatican at the London Conference on Nazi Gold. The London Conference was a landmark in the international community's effort to illuminate long-obscured facts from that dark chapter in history. Significant progress was made

in coordinating research, addressing methodological issues and encouraging governments to open their archives and to make their records fully accessible. The London Conference highlighted as never before the international dimensions of the issue of looted gold, and catalyzed the work of the national commissions and others working to complete the historical record on this complex subject.

(*Id.* at xix.) In December of the following year, "[i]n order to sustain [the] positive momentum of the London Conference," (*see id.* at xx), the State Department co-hosted in Washington, D.C., the Washington Conference on Holocaust–Era Assets. The State Department's commitment to resolving this "complex subject" (*see id.* at xix) reflects a preference for a cooperative approach at the governmental level and further suggests that courts should not intervene.[8]

■ Ultimately, a court must consider the totality of the circumstances in determining whether a claim is one committed to the political branches for resolution. For all of the reasons discussed above, the Court finds plaintiffs' claims are such that they have been committed to the political branches and, as such, are not justiciable.

### 2. *Lack of Judicially Discoverable and Manageable Standards for Resolving the Issues*

The second of the *Baker* factors likewise requires dismissal, on the ground that there exist no "judicially discoverable and manageable standards" for resolving plaintiffs' claims.[9] *See Baker,* 369 U.S. at 217,

---

8. Plaintiffs question the efficacy of the above-referenced and other diplomatic negotiations with the Vatican. As was noted in *Iwanowa,* however, "[c]ourts may not pass judgment upon the political negotiations of the executive branch and the international community." *Iwanowa,* 67 F.Supp.2d at 487.

9. Plaintiffs' reliance on *Koohi v. U.S.,* 976 F.2d 1328 (9th Cir.1992) to support an argument to the contrary is misplaced. In *Koohi,* a civilian Iranian airplane was mistakenly shot down by the U.S. Navy. The claims were for wrongful death, negligence and product liability. *Id.* In contrast to the instant case,

82 S.Ct. 691. Courts have repeatedly recognized that they are ill-equipped to adjudicate class actions based on the kinds of claims presented here, and that such claims are the province of the political branches. In *Kelberine v. Societe Internationale, Etc.*, 363 F.2d 989 (D.C.Cir.1965), a class action against a Swiss holding company, based on a conspiracy by its German subsidiary and others to seize property and enforce slave labor during World War II, the Court of Appeals affirmed the district court's dismissal of the complaint on the ground that the plaintiffs' claims "pos[ed] an insoluble problem if undertaken by courts without legislative or executive guidance, authorization or support." *Id.* at 995. In so ruling, the court observed:

> The span between the doing of the damage and the application of the claimed assuagement is too vague. The time is too long. The identity of the alleged tortfeasors is too indefinite. The procedure sought—adjudication of some two hundred thousand claims for multifarious damages inflicted twenty to thirty years ago in a European area by a government then in power—is too complicated, too costly, to justify undertaking by a court without legislative provision of the means wherewith to proceed.

*Id.*

Thirty-three years later, in *Iwanowa*, the court held the claims raised therein were non-justiciable on the same grounds. *See Iwanowa*, 67 F.Supp.2d at 489. Among the impediments to meaningful adjudication noted by the court were "the task of identifying and notifying thousands of potential plaintiffs around the world," the "multitude of sources" from which the relevant materials would come, and the likelihood that the parties would be unable

to gather all of the "pertinent data." *See id.* at 489. All of these concerns are equally applicable to the instant action. As expressed by the court in *Iwanowa*: "The specter of adjudicating thousands of claims arising out of a war that took place more than fifty years ago amounts to a more daunting task for this Court to tackle than the *Kelberine* Court could have ever contemplated." *Id.*

Similarly, in *Burger–Fischer*, the district court noted the lack of judicial standards to adjudicate plaintiffs' claims:

> Wrongs were suffered not only by the classes of persons represented in these proceedings, however, but by many other classes of persons in many lands. They, too, had claims against German assets. By what conceivable standard could a single court arrive at a fair allocation of resources among all the deserving groups? By what practical means could a single court acquire the information needed to fashion such a standard?

*Burger–Fischer*, 65 F.Supp.2d at 284.

Plaintiffs point to two recent district court decisions in an effort to demonstrate that discoverable and manageable standards for resolving their claims exist: In *In re Holocaust Victim Assets Litigation*, 105 F.Supp.2d 139 (E.D.N.Y.2000), a class action against Swiss banks for concealing assets of Holocaust victims, accepting and laundering illegally obtained Nazi loot, and transacting in the profits of slave labor, and *In re Austrian and German Bank Holocaust Litigation*, 80 F.Supp.2d 164 (S.D.N.Y.2000), a class action against Austrian and German banks for conversion of Holocaust victims' assets, profiting from forced and slave labor, and other violations of international law arising out of Nazi activities.

---

all of the claims arose from a single event, the event occurred within a recent time frame, and the plaintiffs and their heirs were easily identifiable and limited in number. *See Koohi*, 976 F.2d at 1330.

Plaintiffs' reliance on these cases is misplaced. In each instance, the district court exercised jurisdiction over the action for the sole purpose of approving a proposed class settlement. *See id.* at 167; *In re Holocaust Victim Assets Litigation,* 105 F.Supp.2d at 141–42. Moreover, in determining the propriety of those settlements, both courts recognized the significant practical and legal obstacles to litigation of the plaintiffs' claims. *See In re Holocaust Victim Assets Litigation,* 105 F.Supp.2d at 148 (citing *Iwanowa* and *Burger–Fischer* "as a reality check for those objectors who believe that strong moral claims are easily converted into successful legal causes of action"); *In re Austrian and German Bank Holocaust Litigation,* 80 F.Supp.2d at 177 ("The Court is impressed by the factual difficulties and legal defenses that plaintiffs face in further litigation of their claim. Each of the defenses outlined by the defendants appear to have merit.").[10] Neither court reached the issue of the justiciability of the plaintiffs' claims, nor were they faced with the task of actually adjudicating them.[11]

Plaintiffs also cite *Bodner v. Banque Paribas,* 114 F.Supp.2d 117 (E.D.N.Y. 2000), in support of their contention that plaintiffs' claims are justiciable. *Bodner* involved a class action by descendants of Jewish customers of French banking institutions, asserting a conspiracy on the part of the defendant banks to expropriate money and other property deposited therein during the Nazi occupation. *See Bodner,* 114 F.Supp.2d at 121–23. *Bodner* is distinguishable from the instant action on both its facts and the legal issues presented. The plaintiffs' claims in *Bodner* were based on the expropriation of distinct sums of money and deposited assets that remained in the hands of the defendant banks. *See id.* Moreover, the political question doctrine was never raised by defendants in their motion to dismiss, and thus was not before the court. *See Bodner,* 114 F.Supp.2d at 129 n. 9.[12]

Here, by contrast, plaintiffs do not seek recovery of money and assets withheld from specific accounts but, rather, the undetermined value of property stolen in untold ways in a multiplicity of regions by both military personnel and civilians.[13]

---

**10.** In both cases the defendants had moved to dismiss the plaintiffs' claims on numerous legal grounds, including the political question doctrine. Adjudication of those issues was precluded by the settlements.

**11.** Plaintiffs argue that the Court should decline to dismiss their claims because other class actions have provided the "catalyst" for international agreements and "leverage" for resolution by settlement. (*See* Pl's Opp. to IOR's Mot. To Dismiss at 21.) Whether a settlement is reached in any individual case, however, has no bearing on the legal issues presented in the absence of such settlement. *See, e.g., id.* (considering apparent merit of available defenses in assessing fairness of class settlement).

**12.** For similar reasons, the Court of Appeals' recent decision in *Altmann v. Republic of Austria,* 317 F.3d 954 (9th Cir.2002), is inapplicable. *Altmann* concerned a claim for recovery of six paintings seized by the Nazis from the plaintiff's uncle and ultimately housed in the Austrian Gallery. There, in contrast to the instant action, the plaintiff sought the return of specific, identifiable property, and the political question doctrine was not at issue.

**13.** It also bears noting that the perpetrators of the crimes alleged are not uniformly identified. In some instances the Ustasha is expressly implicated (*See, e.g.,* TAC ¶ 24 (alleging plaintiff Mila Conger "was taken by Ustasha to Karlovac as a forced laborer.")) In others, the perpetrators are less clearly identified. (*See, e.g.,* TAC ¶ 1 (alleging plaintiff Emil Alperin resided in Odessa, Ukraine, where "Germans and allied Fascists, believed to be Croatians, looted and destroyed all [his] household belongings and personal property"; ¶ 21 (alleging plaintiff Milorad Skoric's family was taken away and their village of Loncarica, Yugoslavia, was burned down, "apparently by the Ustasha."))) In

Moreover, plaintiffs seek such recovery out of an undivided portion of the Ustasha Treasury transferred to the IOR. Such claims require a review of materials from a multitude of foreign sources that, "by sheer bulk alone," are likely to be unmanageable. *See Atlee*, 347 F.Supp. at 702. Compounding the problem, "there is a distinct possibility that the parties might not be able to compile all of the relevant information, thus making any attempt to justify a ruling on the merits of an issue that will affect the nation difficult and imprudent." *See Iwanowa*, 67 F.Supp.2d at 484; *see also Atlee*, 347 F.Supp. at 702 (noting "the inherent inability of a court to predict the international consequences flowing from a decision on the merits.") Further, plaintiffs' claims require this Court to resolve the competing rights to the Ustasha Treasury of potentially hundreds of thousands of citizens of various nations, funds as to which any number of persons harmed by the Ustasha regime, both represented and not represented in these proceedings, might equally assert a claim.

In sum, the instant action presents the same intractable problems as were recognized in *Kelberine, Iwanowa,* and *Burger–Fischer*. In this instance, there exist essentially insurmountable barriers to identifying and dividing that portion of the Ustasha Treasury transferred to the OFM and IOR. In other words, plaintiff's claims present issues for which this Court lacks "judicially discoverable and manageable standards." *See Baker*, 369 U.S. at 217, 82 S.Ct. 691.

### CONCLUSION

For the reasons expressed, the Court finds that plaintiffs claims present political questions that are not justiciable and, consequently, must be dismissed. This is not to suggest that plaintiffs are undeserving of relief. Indeed it is the very magnitude of the horrors giving rise to plaintiffs' claims and of the war in which they arose that places those claims beyond the purview of this Court. As one court has recognized:

> "It goes without saying that the events which form the backdrop of this case make up one of the darkest periods of man's modern history.... At the same time, however, it must be understood that the law is a tool of limited capacity. Not every wrong, even the worst, is cognizable as a legal claim."

*In re Holocaust Victim Assets Litigation,* 105 F.Supp.2d at 149.

Accordingly, the motions are hereby GRANTED and the above-entitled action is hereby DISMISSED as to the moving defendants.

This order closes Docket Nos. 85, 90, 166.

**IT IS SO ORDERED.**

still other instances, the perpetrators are not identified at all, the allegations having been made in the passive voice. (*See, e.g.,* ¶ 27

(alleging plaintiff David Levy's "family property was taken and plaintiff was made a forced laborer."))