TROTT, Circuit Judge,
concurring in part, and dissenting in part:
It is unlikely that a better case could be made for the majority’s view that some of these matters are justiciable than the one made by Judge McKeown in her well written opinion. Nevertheless, and with all due respect to my esteemed colleagues, I find part of their analysis unconvincing. In the main, the segregation for analytical purposes of the plaintiffs’ claims into two distinct groups — “Property Claims” as distinguished from “War Objective Claims”— splits the atom where it is not divisible. In this respect, I agree with the defendants/appellees: “All claims asserted by plaintiffs are ‘inextricably intertwined’ with the Executive Branch’s powers over war-related crimes, such that the judiciary is powerless to adjudicate them.” Accordingly, although I agree that the so-called War Objective Claims are not justiciable, I respectfully dissent as to the others.
I concur in and adopt the district court’s view that appellants’ complaint unmistakably and inextricably raises issues that our Constitution commits to the legislative and executive branches of our government, not to the judiciary. Alperin v. Vatican Bank, 242 F.Supp.2d 686 (N.D.Cal.2003). This case fatally falls into at least two of the off-limits political question categories — defined as “formulations” — in Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) :(1) “a textually demonstrable constitutional commitment of the issue to a coordinate political department;” and (2) “a lack of judicially discoverable and manageable standards for resolving it.” Id.
I
As to the primary formulation — a constitutional commitment of the issue to a political department — the record compels us to take our lead from Chief Justice Marshall who said that “[qjuestions, in their nature political, or which are, by the Constitution and laws, submitted to the executive, can never be made in this court.” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803) (emphasis added). The Baker court repeated this “clearly settled” principle, which emanates from our Constitution’s careful allocation and separation of powers between our three branches, and in so doing identified “foreign relations” as one of the areas in which nonjusticiable political questions routinely arise, citing Oetjen v. Cent. Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918): “The conduct of the foreign relations of our Government is committed by the Constitution to the executive and legislative— ‘the political’- — departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.” Baker, 369 U.S. at 211 n. 31, 82 S.Ct. 691. In elaboration of this doctrine, the Oetjen court said,
The principle that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court, such as we have here, as it was held to be to the cases cited, in which claims for damages were based upon acts done in a foreign country, for it rests at last upon the highest considerations of international comity and expediency. To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly “imperil the amicable relations between governments and vex the peace of nations.”
246 U.S. at 303-04, 38 S.Ct. 309.
One of the earliest cases involving the respective authority of courts and Con *564 gress appears to be United States v. Palmer, 16 U.S. (3 Wheat.) 610, 4 L.Ed. 471 (1818), a case involving inter alia a robbery committed on the high seas by a non-citizen on board a ship belonging exclusively to subjects of a foreign state. The Court held (1) that a specific act of Congress criminalizing piracy did not give authority to our federal courts to take cognizance of, try, and punish such an act on the high seas as robbery, and (2) that the courts are not empowered to so act without authority from Congress. Id. at 633-35. In explanation of this decision, Chief Justice Marshall said,
Those questions which respect the rights of a part of a foreign empire, which asserts, and is contending for its independence, and the conduct which must be observed by the courts of the union towards the subjects of such section of an empire who may be brought before the tribunals of this country,.are equally delicate and difficult.
As it is understood that the construction which has been given to the act of Congress, will render a particular answer to them unnecessary, the court will only observe, that such questions are generally rather political than legal in their character. They belong more properly to those who can declare what the law shall be; who can place the nation in such a position with respect to foreign powers as to their own judgment shall appear wise; to whom are entrusted all its foreign relations; than to that tribunal whose power as well as duty is confined to the application of the rule which the legislature may prescribe for it. In such contests a nation may engage itself with the one party or the other — may observe absolute neutrality — may recognize the new state absolutely — or may make a limited recognition of it. The proceeding in courts must depend so entirely on the course of the government, that it is difficult to give a precise answer to questions which do not refer to a particular nation. It may be said, generally, that if the government remains neutral, and recognizes the existence of a civil war, its courts cannot consider as criminal those acts of hostility which war authorizes, and which the new government may direct against its enemy. ' To decide otherwise, would be to determine that the war prosecuted by one of the parties was unlawful, and would be to arrange the nation to which the court belongs against that party. This would transcend the limits prescribed to the judicial department.
Id. at 634-35 (emphasis added).
The Court registered a similar observation in Foster v. Neilson:
In a controversy between two nations concerning nationál boundary, it is scarcely possible that the courts of either should refuse to abide by the measures adopted by its own government. There being no common tribunal to decide between them, each determines for itself on its own rights, and if they cannot adjust their differences peaceably, the right remains with the strongest. The judiciary is not that department of the government to which the assertion of its interests against foreign powers is confided; and its duty commonly is to decide upon individual rights, according to those principles which the political departments of the nation have established.
27 U.S. (2 Pet.) 253, 307-08, 7 L.Ed. 415 (1829), overruled on other grounds by United States v. Percheman, 32 U.S. (7 Pet.) 51, 8 L.Ed. 604 (1833) (emphasis added).
The Supreme Court has spoken frequently about this issue, and each time it *565 has reiterated the structural and prudential proposition that the “President also possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation’s organ in foreign affairs.” Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 109, 68 S.Ct. 431, 92 L.Ed. 568 (1948). Accordingly, the Court has made it clear that
the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative.... They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.
Id. 333 U.S. at 111, 68 S.Ct. 431. See also Schroder v. Bush, 263 F.3d 1169, 1175 (10th Cir.2001).
Parenthetically, unlike the majority, I read this principle to include all matters that fall by their constitutional DNA into this sphere, whether the political branches have done anything about them or not. With all respect to my valued colleagues, I see it as a mistake to measure this issue of justifiability by a “this lawsuit is the only game in town” standard. This is not our “game,” period, and we do not become vested with jurisdiction by default of the other branches. The majority opinion indicates that Executive silence is somehow relevant. I humbly disagree. The silence of another Branch cannot give us jurisdiction we do not otherwise have. The nonexistence of an executive agreement is meaningless.
Notwithstanding appellants’, lawyers’ ability to cast this dispute in “garden-variety” legal terms, i.e., conversion, unjust enrichment, restitution, etc., the ineffable fact remains that this functionally is a lawsuit against- (1) the Vatican itself, (2) the Vatican Bank, which is an instrumentality of the' sovereign state of the Vatican, and (3) untold others — including probably the Pope — seeking relief for World War II wrongs against foreigners committed by the Nazis and their allies in Europe almost sixty years ago. As Judge Debevoise said in Burger-Fischer v. DeGussa AG, 65 F.Supp.2d 248, 281 (D.N.J.1999), “It is not accurate to characterize the present actions as simply [typical] controversies between private parties.” Much more is clearly at stake. Stripped to its essentials, this is a derivative lawsuit against a sovereign seeking “reparations” for injuries and losses suffered during wartime at the hands of the Nazis and their alleged accomplices. As acknowledged by the majority, the Vatican has filed a note of protest and asked our State Department to intervene. This set of facts and circumstances involving a foreign sovereign strikes me as demanding a “single-voiced statement” of our government’s views, not a series of judgments by our courts. Baker, 369 U.S. at 211, 82 S.Ct. 691. I conclude, therefore, that the foreign policy quintessence of this case renders it as a subject matter beyond the power of the judiciary to intrude or to inquire.
Judge Greenaway’s astute analysis in Iwanowa v. Ford Motor Company, 67 F.Supp.2d 424, 485 (1999) is apposite:
The executive branch has always addressed claims for reparations as claims between governments. Historically, at the end of a war, there has always been a declaration of victorious nations and defeated nations. As part of that process, the victorious nations invariably discuss the reparations that the defeated nations must pay to compensate the prevailing countries and their nationals for the loss that the aggressor country has *566 caused. The nature of war is such that the governments of the victorious nations determine and negotiate the resolution of the claims of their nationals'by way of agreements between the nations involved or affected by the war. This is evident from the reparations provisions in the Treaty of Versailles following World War I, and the discussion of reparations in the Yalta Conference, the Potsdam Conference and the Paris Reparations Treaty at the end of World War II. More recently, at the end of the Gulf War, the United Nations established an international claims resolution tribunal to resolve claims against Iraq. See Elyse J. Garmise, The Iraqi Claims Process and the Ghost of Versailles, 67 N.Y.U.L.Rev. 840, 841 (1992). Thus, it is evident that responsibility for resolving forced labor claims arising out of a war is constitutionally committed to the political branches of government, not the judiciary.
In a footnote to this discussion, the court observed that the “ ‘concept of reparations encompasses all international law claims for compensation related to war [including] individual claims by injured citizens of victorious powers.’ ” Id. at 485 n. 84 (quoting Ministerial Director Horst Teltschik).
When California attempted by legislation to insert itself into Holocaust-era insurance policies, the Supreme Court stepped in and held that California’s law was preempted because it interfered with the President’s conduct of our Nation’s foreign policy. In reversing our Ninth Circuit opinion to the contrary, see Gerling Global Reinsurance Corp. of Am. v. Low, 296 F.3d 832 (9th Cir.2002), the Court made certain observations about the authority of the President that add considerable weight against the view that Alperin’s claims are justiciable:
Nor is there any question generally that there is executive authority to decide what that [foreign relations] policy should be.' Although the source of the President’s power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the “executive Power” vested in Article II of the Constitution has recognized the President’s “vast share of responsibility for the conduct of our foreign relations.”
Am. Ins. Ass’n v. Garamendi 539 U.S. 396, 414, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (citation omitted). The Garamendi court continued:
At a more specific level, our cases have recognized that the President has authority to make “executive agreements” with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic. See Dames & Moore v. Regan, 453 U.S. 654, 679, 682-683, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); United States v. Pink, 315 U.S. 203, 223, 230, 62 S.Ct. 552, 86 L.Ed. 796 (1942); United States v. Belmont, 301 U.S. 324, 330-331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); see also L. Henkin, Foreign Affairs and the United States Constitution 219, 496, n. 163 (2d ed.1996) (“Presidents from Washington to Clinton have made many thousands of agreements ... on matters running the gamut of U.S. foreign relations”). Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice, the first example being as early as 1799, when the Adams administration settled demands against the Dutch Government by American citizens who lost their cargo when Dutch privateers overtook the schooner Wilmington Packet. See Dames & Moore, supra, at 679-680, and *567 n. 8, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918.
* * *
To begin with, resolving Holocaust-era insurance claims that may be held by residents of this country is a matter well within the Executive’s responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be “sources of friction” acting as an “impediment to resumption of friendly relations” between the countries involved, Pink, supra, at 225, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, there is a “longstanding practice” of the national Executive to settle them in discharging its responsibility to maintain the Nation’s relationships with other countries, Dames & Moore, 453 U.S., at 679, 101 S.Ct. 2972, 69 L.Ed.2d 918. The issue of restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the- Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.
Id. at 415, 420-21, 123 S.Ct. 2374 (emphasis added).
Finally, as we recognized, in. Deutsch v. Turner Corp., 324 F.3d 692, 712-13 (9th Cir.2003),
The United States has already exercised its own exclusive authority to resolve the war, including claims arising out of it. It did not choose, however, to incorporate into that resolution a private right of action against our wartime enemies or their nationals. The United States resolved the war against Germany by becoming a party to a number of treaties and international agreements, beginning with the 1945 agreements at Yalta and Potsdam, in which the United States, Britain, and the Soviet Union agreed to extract reparations from Germany and .its nationals but did not include a private right of action against either.... Most recently, the Foundation Agreement of July 17, 2000, an executive agreement between the governments of Germany and the United States, provided a limited form of remedy for claimants such as Deutsch.
I would add that we entered into a similar treaty with Italy in 1947. Article 75 of that Treaty provides with respect to restitution-as follows:
1. Italy accepts the principles of the United Nations Declaration of January 5, 1943, and shall return, in the shortest possible time, property removed from the territory of any of the United Nations.
2. The obligation to make restitution applies to all identifiable property at present in Italy which was removed by force or duress by any of the Axis Powers from the territory of any of the United Nations, irrespective of any subsequent transactions by which the present holder of any such property has secured possession.
8. The Italian Governmént shall restore to[the United Nation] all monetary gold looted or wrongfully removed to Italy.
Treaty of Peace with Italy, Feb. 10, 1947, U.S.-Italy, United States Statutes At Large, Vol. 61, pp. 1400-01.
*568 II
As recognized by the majority, “the potential class is massive,” and, as the district court concluded, the case as pleaded would be unmanageable. This unimpeachable observation brings this lawsuit within Baker’s second category: the task is beyond the competence of a court of law. The district court relied, in this respect, on Kelberine v. Societe Internationale, 863 F.2d 989 (D.C.Cir.1966), which correctly said,
The span between the doing of the damage and the application of the claimed assuagement is too vague. The time is too long. The identity of the alleged tortfeasors is too indefinite. The procedure sought — adjudication of some two hundred thousand claims for multifarious damages inflicted twenty to thirty years ago in a European area by a government then in power — is too complicated, too costly, to justify undertaking by a court without legislative provision of the means wherewith to proceed.
Id. at 995.
I agree with our prudent district court’s carefully considered opinion, which echos the Supreme Court’s concerns in Waterman about the aptitude and facilities in this context, that this case as presented would lack judicial reins:
Here, by contrast, plaintiffs do not seek recovery of money and assets withheld from specific accounts but, rather, the undetermined value of property stolen in untold ways in a multiplicity of regions by both military personnel and civilians. Moreover, plaintiffs seek such recovery out of an undivided portion of the Ustasha Treasury transferred to the IOR. Such claims require a review of materials from a multitude of foreign sources that, “by sheer bulk alone,” are likely to be unmanageable. See Atlee, 347 F.Supp. 689, 701 (E.D.Pa.1972). Compounding the problem, “there is a distinct possibility that the parties might not be able to compile all of the relevant information, thus making any attempt to justify a ruling on the merits of an issue that will affect the nation difficult and imprudent.” See Iwanowa, 67 F.Supp.2d [424, 483-84 (D.N.J.1999) ]; see also Atlee, 347 F.Supp. at 702 (noting “the inherent inability of a court to predict the international consequences flowing from a decision on the merits.”) Further, plaintiffs’ claims require this Court to resolve the competing rights to the Ustasha Treasury of potentially hundreds of thousands of citizens of various nations, funds as to which any number of persons harmed by the Ustasha regime, both represented and not represented in these proceedings, might equally assert a claim.
Alperin, 242 F.Supp.2d at 694-95. It will be interesting to say the least to watch the district court struggle on remand to enforce its rulings against the Vatican. Based on my experience with litigation involving foreign nations, it will be just a matter of time until the State and Justice Departments are dragged into this case as the district court begins to reach out for evidence and witnesses and to exercise its power to enforce its orders.
Ill
No one could possibly be comfortable identifying a barrier to the relief sought by these plaintiffs, persons who suffered some of the most unspeakably grievous injuries to their lives and families. As Judge Reinhardt said in Deutsch, the Holocaust was “the most atrocious act ever perpetrated by a civilized (or uncivilized) people, an act unparalleled in history.” 324 F.3d at 704. Nevertheless, our courts are not the appropriate fora for redress. What the majority has unintentionally accomplished in *569 embracing this case is nothing less than the wholesale creation of a World Court, an international tribunal with breathtaking and limitless jurisdiction to entertain the World’s failures, no matter where they happen, when they happen, to whom they happen, the identity of the wrongdoer, and the sovereignty of one of the parties. The consequences of this holding are overwhelming. I need go no deeper than Jhe third amended class action complaint to illustrate this point:
1. This is a civil action arising under customary international law and the laws of the United States of America on behalf of named Plaintiffs and a class of all Serbs, Jews, and former Soviet Union citizens (and their heirs and beneficiaries), who suffered physical, monetary and/or property losses including slave labor, due to the systematic and brutal extermination of Jews, Serbs, and Romani by the Nazi puppet Regime, The Independent State of Croatia (NDH) led by Pavelic’s Ustasha Regime, and as a result of the occupation of. the former Soviet Union by Croatian military forces in concert with their German occupation forces. This is an action against the Vatican Bank, Franciscan Order and Unknown Catholic Religious Orders, Croatian Liberation Movement (HOP), Swiss National Bank (SNB) and as yet unnamed recipients of Nazi and Ustasha Loot, Swiss, Austrian, Argentine, Spanish, Italian, Portuguese, and German banking institutions and California and other United States correspondent banks for their participation in and benefit from the Ustasha Regime’s acts of cruelty and violence.
2. Plaintiffs and their heirs and beneficiaries seek accounting, restitution, disgorgement, and to recover damages arising out of the participation of Defendants, Vatican Bank or Istituto Per Le Opere Di Religione (hereinafter referred to as IOR), the Franciscan Order (OFM) and Unknown Catholic Religious Orders, Croatian Liberation Movement (HOP), Swiss National Bank' (SNB), unknown recipients of Nazi and Ustasha-loot, and other banking institutions and correspondent banks and religious orders and organizations in a common scheme and course of conduct: (a) to profit from, both directly and indirectly, the inhumane and genocidal system instituted by the Nazi-directed Ustasha Regime in Croatia and territories subject to Croatian civil or military occupation upon those peoples that it viewed, not as human beings, but as subhuman according to Nazi and Ustasha ideology; (b) to obtain, accept, conceal, convert and profit from assets looted by the Ustasha Regime and deposited in, or liquidated through, the IOR, SNB, unnamed Doe Defendant Banks, and Franciscan Order during the ascendancy of the Ustasha Regime and following the demise of the Regime at the behest of the former Ustasha and Nazi leaders,through the offices of the Franciscan Order; and (c) to retain and convert assets deposited in their institutions by the Croatian Liberation Movement, Ustasha and/or the Franciscan Order and Unknown Catholic Religious Orders.
3.Defendants committed, conspired to commit, and aided and abetted others who committed crimes against peace, war crimes and crimes against humani- • ty. Defendants assisted the Ustasha Regime and its leaders as well as prominent Nazis to successfully evade justice for their genocidal crimes by concealing and making available the considerable assets of the Ustasha Treasury.
* * *
WHEREFORE, Plaintiffs pray that the Court:
*570 1. Certify this action as a class action pursuant to FEDERAL RULE OF CIVIL PROCEDURE 23, and designating named Plaintiffs as the class representatives and counsel for Plaintiffs as Class counsel.
2. Declare that Defendants by trafficking in, retaining, disposing of and concealing assets looted from targets of the Ustasha Regime with knowledge that the assets had been obtained through the systematic persecution, torture, slave labor, force, and murder, violated international treaties and customary international law enforceable in this Court as federal common law, the law of the nations and international law.
3. Order Defendants to make available all information relating to the Ustasha Treasury in order that an accounting of assets may be realized.
4. Direct Defendants to return all identifiable property looted from Plaintiffs and received by Defendants.
5. Award Plaintiffs the value of any identified property deposited by, or looted from, Plaintiffs and received by Defendants plus interest compounded annually since 1941.
6. Award Plaintiffs compensatory and punitive damages arising out of Defendants’ unlawful behavior in trafficking in, retaining, disposing and concealing Looted Assets or profits of the Ustasha Regime with knowledge that the assets or profits were the fruits of Nazi-Ustasha violations of international law and were used to assist war criminals to evade justice.
7. Order Defendants to disgorge any profits earned by trafficking in, disposing of or concealing the Ustasha Treasury which was the fruits of violations of international law.
8. Grant Plaintiffs a jury trial on all issues so triable.
9. Award Plaintiffs the costs of this action, including reasonable attorneys’ fees and expert fees; and,
10. Grant such other and further relief as shall seem just to the Court.
Our unauthorized transformation of our district courts into an open-door international tribunal far overreaches the authority of “the least dangerous branch” of our government. This opinion, albeit well-intentioned, extends the concept of judicial authority into unknown territory and mistakenly exercises power and competence that plainly belongs to the President and to Congress. Today, it is the Vatican and the Holocaust. Tomorrow, will it be horrors from Haiti, Cuba, Rwanda, South Africa, the Soviet Union, Bosnia, Sudan, Somalia, North Korea, Iraq, and who knows where? The majority opinion sends our district judges on a crusade from which they are not equipped and which is doomed to flounder. As a class action, it will make all others seem like cakewalks. One can only wonder if the filing of this lawsuit is nothing more than a ploy to force the President and the State Department to take action. Similarly, one can only wonder why the beleaguered State Department would stand silently by and allow this case to continue — in the Ninth Circuit no less, where mistakenly we would have allowed the Garamendi litigation to proceed.
Thus, I respectfully disagree that Alperin’s unseverable “garden-variety” claims are justiciable.