11-4338-cv
Konowaloff v. Metropolitan Museum of Art

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued: April 20, 2012          Decided: December 18, 2012 )

Docket No. 11-4338-cv

_____

PIERRE KONOWALOFF, Paris, France,

                                        Plaintiff-Appellant,

                        - v. -


THE METROPOLITAN MUSEUM OF ART, New York, New York,

                                        Defendant-Appellee.

_____

Before: JACOBS, Chief Judge, KEARSE and McLAUGHLIN, Circuit Judges.

        Appeal from a judgment of the United States District Court for the Southern District of New York, Shira A. Scheindlin, Judge, dismissing, on the basis of the act of state doctrine, plaintiff's action against defendant museum for its acquisition, possession, display, and retention of a painting confiscated by the Russian revolutionary government from plaintiff's great-grandfather in 1918.  See 2011 WL 4430856 (Sept. 22, 2011).

        Affirmed.

JAMES E. TYRRELL, Jr., Newark, New Jersey (Joseph E. Hopkins, Jonathan M. Peck, Calvin W. Souder, Patton Boggs, Newark, New Jersey; Paul V. Curcio, Philip Y. Brown, Adam M. Weisberger, Adler Pollock & Sheehan, Boston, Massachusetts; Allan Gerson, AG International Law, Washington, D.C., on the brief), for Plaintiff-Appellant.

DAVID W. BOWKER, Washington, D.C. (Wilmer Cutler Pickering Hale & Dorr, Washington, D.C.; Charu A. Chandrasekhar, Michael D. Gottesman, Wilmer Cutler Pickering Hale & Dorr, New York, New York, on the brief), for Defendant-Appellee.

KEARSE, Circuit Judge:

Plaintiff Pierre Konowaloff appeals from a judgment of the United States District Court for the Southern District of New York, Shira A. Scheindlin, Judge, dismissing his action against defendant Metropolitan Museum of Art (the "Museum") for its acquisition, possession, display, and retention of a painting that had been confiscated by the Russian Bolshevik regime from Konowaloff's great-grandfather in 1918. The district court granted the Museum's motion to dismiss Konowaloff's Amended Complaint, ruling that the pleading reveals that his claims are barred by the act of state doctrine. On appeal, Konowaloff contends principally that the district court erred in holding that the painting was taken pursuant to a valid act of state despite factual allegations in his Amended Complaint to the contrary. For the reasons that follow, we find Konowaloff's contentions to be without merit, and we affirm the judgment of the district court.

I. BACKGROUND

The allegations in Konowaloff's Amended Complaint are described in detail in the September 22, 2011 Opinion and Order of the district court, reported at 2011 WL 4430856, familiarity with which is assumed. The factual allegations material to Konowaloff's challenge to the court's act-of-state ruling, taken as true and with all reasonable inferences drawn in favor of Konowaloff for purposes of our review of a dismissal based on the pleading, included the following.

A. The Allegations of the Amended Complaint

Konowaloff is the sole heir to the estate of his great-grandfather Ivan Morozov, a Russian national who prior to 1920 lived in Moscow, and who prior to World War I had a modern art collection that ranked "among the finest in Europe" (Amended Complaint ¶ 8; see id. ¶¶ 6-7, 12). In 1911, Morozov acquired, for value, a Cézanne painting known as Madame Cézanne in the Conservatory or Portrait of Madame Cézanne (the "Painting"). (See id. Introductory paragraph and ¶ 6.)

The March 1917 revolution in Russia overthrew Tsar Nicholas II and installed a Provisional Government, which was promptly recognized by the United States. (See id. ¶ 9.) In November 1917, "the Bolsheviks (the Bolshevik faction of the Russian Social Democratic Workers Party) seized power from the Provisional Government." (Id.) The Bolshevik--or "Soviet"--regime, called the Russian Socialist Federated Soviet Republic ("RSFSR") (see id.), and its official successor, called the Union of Soviet Socialist Republics (or "U.S.S.R.") (see id. ¶ 36), are referred to

collectively as the "Soviet Union" or the "Soviet government." The United States did not recognize the Soviet government until November 16, 1933. (See id. ¶ 36.)

Immediately after gaining power in 1917, the Bolsheviks set about issuing "numerous decrees" nationalizing property, "[f]or example, . . . abolish[ing] the private ownership of land" on November 8, 1917, and "making museums . . . property of the state." (Id. ¶ 13.) "The Bolsheviks confiscated artworks, particularly of Tsarist origins, for possible sale abroad." (Id. ¶ 15.) They also took steps to conceal or destroy evidence of the origins of the artwork. (See id.)

"On December 19, 1918, . . . the Bolsheviks decreed that the 'art collection [] of I.A. Morozov,' including the Painting, was 'state property' . . . ." (Amended Complaint ¶ 11; see id. ¶ 57 ("The Painting was confiscated by the RSFSR in 1918, in an act of theft. Morozov did not voluntarily relinquish the Painting.").) As a result of that decree "Morozov was deprived of all his property rights and interests in the Painting" and "did not . . . receive any compensation for being deprived of his rights and interests in the Painting." (Id. ¶ 11.) "The December 19, 1918 order"--which was directed only at the art collections of Morozov and one other family--"was tantamount to a bill of attainder, meting out punishment to particular individuals without legal process and on account of no sin." (Id. ¶ 14.)

The Amended Complaint alleged that in May 1933, the Painting was acquired by Stephen C. Clark "in a transaction that may have violated Russian law" (id. ¶ 22), including decrees issued in September and October 1918 prohibiting "the export of objects of particular and historical importance," including "artworks" (id. ¶ 29; see also id. ¶ 33). It alleged that "[t]he Soviet state, including its institutions and laws, was distinct from the Communist Party of the Soviet Union" (id.

4

¶ 32); that "[t]he Politburo was the executive arm of the [Communist Party]" (id.); that "[t]he Politburo made the decisions on art sales" (id. ¶ 34) and "secretly approved the sale" of the Painting and other works to Clark (id. ¶ 30); and that "[t]he sale of . . . the Painting[] to Clark in 1933, like the confiscation of the Painting in 1918, was an act of party, not an act of state. Party actions in selling the art abroad violated Soviet laws. The Politburo members who ordered the sale of the Painting were acting independently of the Soviet state and were engaged in illegal private trade with western capitalists" (id. ¶ 31).

The Amended Complaint contained extensive descriptions of Clark and the conduct of other persons Konowaloff contends dealt in "stolen art from the Soviet government and transferr[ed] funds into Soviet accounts" (id. ¶ 18; see also id. ¶¶ 15-28) and likely assisted in Clark's purchase of the Painting (see id. ¶¶ 26-28). It alleged that "Clark may have known" that the Painting had been "taken . . . from Morozov without compensation" (id. ¶ 35) and that Clark "made no attempt to contact Morozov's heirs prior to, or at any time after, his purchase of the Painting" (id. ¶ 27). It alleged that Clark "employed a Soviet laundering operation to acquire the Painting" (id. ¶ 26) and "concealed the" Painting's "provenance" (id. ¶ 39).

Clark, who had been a trustee of the Museum (see Amended Complaint ¶ 24), died in 1960 and bequeathed the Painting to the Museum (see id. ¶ 39-40). The Amended Complaint alleged that "the Museum may have known that Clark's bequest involved looted art" (id. ¶ 41) and "may have known that Soviet law prohibited the alienation of Western art unless approved by the highest authorities" (id. ¶ 43). "Yet the Museum did nothing to (1) inquire as to whether Clark had good title; (2) locate the heirs of Ivan Morozov; and (3) ascertain whether the heirs to Ivan Morozov had

5

received compensation for the Painting or had voluntarily given up any claims of title to the Painting." (Id. ¶ 41.)

Konowaloff became the official heir to the Morozov collection in 2002, and in 2008 learned that Morozov had owned the Painting. (See Amended Complaint ¶¶ 51, 53.) In May 2010, he demanded that the Museum return the Painting to him. (See id. ¶ 54.) After the Museum refused, Konowaloff commenced the present action, seeking injunctive, monetary, and declaratory relief.

B. The Decision of the District Court

The Museum moved for dismissal of the Amended Complaint on the grounds that Konowaloff's claims are barred by the act of state doctrine, the political question doctrine, the doctrine of international comity, and the statute of limitations or laches, or, in the alternative, on the ground that the Amended Complaint failed to state a claim on which relief can be granted. The district court concluded that the Museum had met its burden of showing that the act of state doctrine applies to bar Konowaloff's claims. See 2011 WL 4430856, at *8.

Noting the general principle that the act of state doctrine "'precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory,'" id. at *4 (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964) ("Sabbatino")), the court also pointed out that "[c]onfiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law," 2011 WL 4430856, at *8 n.111

6

(internal quotation marks omitted), and that "the act of state doctrine applies 'even if international law has been violated,'" id. at *8 (quoting Sabbatino, 376 U.S. at 431).

The district court also noted (a) that "'when a revolutionary government is recognized as a de jure government, "such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence,"'" 2011 WL 4430856, at *8 (quoting United States v. Pink, 315 U.S. 203, 233 (1942) (quoting Oetjen v. Central Leather Co., 246 U.S. 297, 302-03 (1918))) (emphasis ours); (b) that the United States recognized the Soviet government in 1933 (see Amended Complaint ¶¶ 9, 36) and thereby validated that government's actions from the commencement of its existence, see 2011 WL 4430856, at *8; and (c) that "the Supreme Court" and courts in this Circuit "have consistently held Bolshevik/Soviet nationalization decrees to be official acts accepted as valid for the purpose of invoking the act of state doctrine," id. at *5.

> In the instant case, there is no dispute that the Painting was taken from Morozov by virtue of the 1918 nationalization decree. It is only the legal validity of that decree that is at issue. Thus, this Court is indeed being asked to "decide the legality of [an] official act[] of a sovereign"--precisely the sort of inquiry precluded by the act of state doctrine.

Id. at *6 (emphasis added).

Although the Amended Complaint sought to distinguish acts of the Politburo--characterizing them as the acts of a party, not of the Soviet state--the court pointed out that the alleged

> activities of the Politburo . . . pertain[ed] to the sale of the Painting, not to its confiscation from Morozov. The act of state that I decline to question here is the act of expropriating the Painting from Morozov. I accept that the Soviet government took ownership of the Painting in 1918 through an official act of state, and accordingly, the Painting's sale abroad in 1933--whether legal or illegal, an act of party or an act of state--becomes irrelevant, as Konowaloff lacks any ownership stake in the Painting.

Id. at *5 (emphasis in original) (footnote omitted).

7

The court rejected Konowaloff's contention that the act of state doctrine should not be applied on the ground that "the Painting was 'seized for no legitimate governmental purpose or operation,'" 2011 WL 4430856, at *6 (quoting Memorandum of Law in Support of Konowaloff's Opposition to Defendant Metropolitan Museum of Art's Motion to Dismiss Plaintiff's Amended Complaint ("Konowaloff Opposition Memorandum") at 9), stating that "whether the expropriation was an official act does not turn on the legitimacy or illegitimacy of governmental purposes. The act of state doctrine prohibits just such an inquiry into the purpose of an official act," 2011 WL 4430856, at *6.

The court also rejected the argument that the act of state doctrine should not foreclose Konowaloff's action on the ground that the Soviet Union collapsed in 1991. The Amended Complaint alleged that the U.S.S.R., which was established through the Bolshevik revolution, is no longer an extant and recognized regime, and that the current Russian Federation has been investigating the sales of art abroad during 1928-1933 to determine "to what extent the Soviet government's sale of artworks from museum collections was legal according to existing laws at that time." (Amended Complaint ¶ 47 (internal quotation marks omitted).) The district court concluded that, even if a regime change were dispositive, and not simply one of several factors that may be taken into consideration in determining the applicability of the act of state doctrine, see 2011 WL 4430856, at *6 (citing Sabbatino, 376 U.S. at 428), nothing cited by Konowaloff shows that "the ubiquitous nationalization of property under the Communist regime" has been repudiated; the cited investigation shows only the repudiation of "sale[s]" of art to foreign parties, and the disinclination of the Russian government to adopt a current policy of nationalization, 2011 WL 4430856, at *7 (emphasis added).

8

The district court also rejected Konowaloff's contention that the act of state doctrine should not apply on the basis that

adjudication of these claims "will not impact, let alone harm, U.S. foreign relations," insofar as "the United States, the Russian Federation, and the Commonwealth of Independent States have not indicated any interest in these proceedings." However, the question is not merely whether either the U.S. or the foreign government seeks to intervene in the specific action, but rather whether any decision this Court renders could affect U.S. relations with the foreign government.

Id. at *7 (footnote omitted) (quoting Konowaloff Opposition Memorandum at 11). The court reasoned that

[j]ettisoning long-established precedent regarding Soviet nationalization decrees would call into question long-settled decrees and titles to property resolved under these decrees, and would plainly risk upsetting the Russian Federation, which, plaintiff admits, itself owns much private property taken pursuant to many decrees.

2011 WL 4430856, at *7 (internal quotation marks omitted). The possibility that this "could affect U.S. relations with the foreign government"--"one of the several factors that the Sabbatino Court advised taking into consideration"--favored application of the doctrine. Id. at *7-*8.

The district court having concluded that the act of state doctrine precluded inquiry into the validity of the 1918 decree that confiscated the Painting from Morozov and stripped him of ownership, concluded that Konowaloff's claims for declaratory, injunctive, and monetary relief are foreclosed. The court found it unnecessary to address the Museum's alternative grounds for its motion to dismiss.

9

## II. DISCUSSION

On appeal, Konowaloff contends principally that the district court erred (a) in concluding that the Painting was taken pursuant to a valid act of state despite factual allegations in the Amended Complaint to the contrary, (b) in disregarding the Amended Complaint's factual allegations as to events subsequent to the confiscation that call the Museum's title to the Painting into question and in failing to consider Konowaloff's request for declaratory relief, and (c) in failing to find the act of state doctrine inapplicable on the basis that the Soviet government that appropriated the Painting is no longer extant.

In reviewing the dismissal on the basis of the pleading, we accept the factual allegations of the Amended Complaint as true, and draw all reasonable factual inferences that are available, in order to assess whether the pleading states a legal claim to relief "'that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) ("Twombly")). We are not, however, required to credit legal assertions or "a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555 (internal quotation marks omitted). Within this framework, we conclude that Konowaloff's contentions are without merit, and we affirm the dismissal substantially for the reasons stated by the district court.

Under the act of state doctrine, the courts of the United States, whether state or federal,

> will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles . . . .

Sabbatino, 376 U.S. at 428 (emphasis added). The doctrine "arises out of the basic relationships

10

between branches of government in a system of separation of powers," and "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals . . . in the international sphere." Id. at 423.

Under this doctrine, the validity of the foreign state's act may not be examined "even if the complaint alleges that the taking violates customary international law," id. at 428, or the foreign state's own laws, see id. at 415 n.17 ("The courts below properly declined to determine if issuance of [Cuba's] expropriation decree complied with the formal requisites of Cuban law."). "[W]hen it is made to appear that the foreign government has acted in a given way . . . the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision." Ricaud v. American Metal Co., 246 U.S. 304, 309 (1918); see also W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., 493 U.S. 400, 409 (1990) ("The act of state doctrine . . . requires that, in the process of deciding [a case or controversy], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid.").

After the Executive Branch's recognition of a foreign state, the act of state doctrine applies retroactively to acts that were undertaken by the foreign state prior to official United States recognition:

> [W]hen a government which originates in revolution or revolt is recognized by the political department of our government as the de jure government of the country in which it is established, such recognition is retroactive in effect and validates all the actions and conduct of the government so recognized from the commencement of its existence.

Oetjen v. Central Leather Co., 246 U.S. 297, 302-03 (1918) (emphasis added). The Supreme Court

11

has repeatedly applied this principle to cases involving nationalizations ordered during the Russian Revolution--appropriating the property and assets of various Russian corporations--notwithstanding the fact that formal recognition of the Soviet government by the United States occurred years after the decrees themselves. See United States v. Pink, 315 U.S. 203, 230-33 (1942) (ruling that the decision by the Executive Branch to formally recognize the Soviet government was "conclusive in the courts," and that the act of state doctrine barred United States courts from adjudicating the legality of decrees passed by the Soviet government in 1918 and 1919 nationalizing the Russian insurance industry); United States v. Belmont, 301 U.S. 324, 326, 330 (1937) (taking judicial notice of the fact that in 1933 the United States formally recognized the Soviet government, and concluding that "[t]he effect of this was to validate . . . all acts of the Soviet Government here involved from the commencement of its existence.")

Although, as the district court noted, the act of state doctrine is an affirmative defense as to which the Museum had the burden, a court may properly grant a motion to dismiss on the basis of that doctrine when its applicability is shown on the face of the complaint. Here, it is clear that the Amended Complaint, on its face, shows that Konowaloff's action is barred by the act of state doctrine. The Amended Complaint alleged that the Bolshevik party "seized power from the Provisional Government" in 1917 and established the RSFSR government (Amended Complaint ¶ 9), and that its successor, the U.S.S.R., received official United States recognition in 1933 (see id. ¶ 36); that in 1918 "[t]he Painting was confiscated by the RSFSR" (id. ¶ 57), and "the Bolsheviks decreed" that Morozov's art collection "was state property, to be transferred to the jurisdiction of the People's Commissariat of the Enlightenment" (id. ¶ 11 (internal quotation marks omitted) (emphasis added));

12

that the art collection was placed under control of that Commissariat (see id.); and that in 1919 the art collection "was declared the 'Second Museum of Western Art'" and placed under the supervision of a "political commissar" (id. ¶ 12). When the Painting--described in the Amended Complaint as "art from the Soviet government" (id. ¶ 18)--was ultimately sold, the proceeds were "deposit[ed] in a Soviet-controlled bank account" (id. ¶ 27).

Although Konowaloff contends that the Painting was confiscated by the Bolshevik "party" rather than the Bolshevik government, the district court noted that the Amended Complaint itself "explicitly allege[d] that '[t]he Painting was confiscated by the RSFSR,'" 2011 WL 4430856, at *5 n.92 (quoting Amended Complaint ¶ 57 (emphasis in district court opinion)). Konowaloff objects to the court's acceptance of this allegation on the ground that the allegation continued by asserting that the confiscation was "'an act of theft.'" (Konowaloff brief on appeal at 16-17 (quoting Amended Complaint ¶ 57 (emphasis in brief)).) This objection suffers two flaws. First, the characterization of the Soviet government's appropriation as "an act of theft" is a legal assertion, which the court was not required to accept. Second, the lawfulness of the Soviet government's taking of the Painting is precisely what the act of state doctrine bars the United States courts from determining. Cf. Sosa v. Alvarez-Machain, 542 U.S. 692, 727 (2004) ("It is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens . . . .").

Konowaloff's argument that the act of state doctrine is inapplicable to the 1933 sale of the Painting is far wide of the mark. The relevant act of state revealed by the Amended Complaint

13

occurred in 1918 when the Soviet government appropriated the Painting. Upon that appropriation, as the Amended Complaint alleged, "Morozov was deprived of all his property rights and interests in the Painting. . . ." (Amended Complaint ¶ 11.)

As Konowaloff has no right to or interest in the Painting other than as an heir of Morozov, and Morozov did not own the Painting after the 1918 Soviet appropriation, Konowaloff has no standing to complain of any sale or other treatment of the Painting after 1918, or to seek monetary or injunctive relief, or to seek a declaratory judgment with respect to the Museum's right or title to the Painting, see, e.g., MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (party seeking a declaratory judgment must show "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality" (internal quotation marks omitted) (emphasis added)). The district court properly concluded that in light of the Soviet government's appropriation of the Painting in 1918, the court had no need to consider any alleged legal defects in the sale of the Painting in 1933.

Finally, we reject Konowaloff's contention that the act of state doctrine should not be applied here because the Soviet government is no longer "extant," arguing that hence there is no danger of upsetting diplomatic relations between our countries. Although the fact that the regime whose acts are challenged has been replaced may be a factor in the analysis of whether the act of state doctrine should be applied, that factor is not material here, given that the successor to the U.S.S.R. has not renounced the 1918 appropriations.

Konowaloff's reliance on two decisions of this Court, declining to apply the act of state doctrine after a change in the foreign regime, is misplaced because in each of those cases the new

14

governments had repudiated the prior governments' acts that had deprived the claimants of property. See Bigio v. Coca-Cola Co., 239 F.3d 440, 453 (2d Cir. 2001) (seizures of certain property by the prior government of Egypt were repudiated by the new government's "issu[ance of a decree] which ordered [the recipient of the seized property] to return the [claimants'] property, along with any rental burden and active occupants, or to forward to the [claimants] the proceeds of any sale of the property that might have occurred"); Republic of Philippines v. Marcos, 806 F.2d 344, 359 (2d Cir. 1986) (noting that the successor government of the Philippines had taken steps to investigate and cause the adjudication of any meritorious claims with regard to property taken by the prior regime, and had "come[] into our courts and ask[ed] that our courts scrutinize [those prior state] actions").

As the district court observed in the present case, the current Russian government is apparently disinclined to engage in further appropriations of private property and has initiated an investigation into the 1930s art sales; but it has not repudiated the 1918 appropriation that is the government act that deprived Morozov, and hence Konowaloff, of any right to the Painting. We see no error in the district court's application of the act of state doctrine.

CONCLUSION

We have considered all of Konowaloff's arguments challenging the district court's dismissal of his action on the basis of the act of state doctrine and have found them to be without merit. The judgment of the district court is affirmed.

15